CARLISLE B. ROBERTS, Judge.
 

 
 *[467]
 
 The plaintiff has appealed from the defendant’s Order No. I 79-40, dated July 13, 1979.
 

 The facts have been stipulated. The plaintiff is a federal savings and loan association, chartered under the Homeowners’ Loan Act of 1933 (12 USC, § 1461 et seq.), administered by the Homeowners’ Loan Corporation. Plaintiff has its principal office in Tacoma, Washington, but also maintains four branch offices within the State of Oregon, located in Portland, Eugene, Springfield and Bend. Each branch is independent of the others, each reporting directly to the principal office.
 

 For income tax years before, dining and after the income tax year 1974, plaintiff was subject to the Corporation Income Tax Act of 1955 (ORS Chapter 318). A tax is imposed by that act upon the corporate "net income derived from sources within this state, other than income for which the corporation is subject to the tax imposed by the Corporation Excise Tax Law of 1929 (ORS Chapter 317) according to or measured by its net income.” As in the case of other interstate financial corporations, the income ascribable to Oregon is determined under the Uniform Division of Income for Tax Purposes Act, ORS 314.605 et seq.
 

 The plaintiff is an "insured depository” within the provisions of the Federal Savings and Loan Insurance Corporation Act (12 USC, §§ 1724-1730).
 

 On August 16, 1973, effective 30 days thereafter, Congress approved Public Law 93-100. Section 7 thereof is pertinent to this suit. It reads as follows:
 

 "Sec. 7(a). This section may be cited as the 'State Taxation of Depositories Act’.
 

 "(b) The Congress finds that the national goals of fostering an efficient banking system and the free flow of commerce among the States will be furthered by clarifying the principles governing State taxation of interstate transactions of banks and other depositories. Application of taxes measured by income or receipts, or other 'doing business’ taxes in States
 
 other than the
 
 
 *[468]
 

 States in which depositories have their principal offices should be deferred until such time as uniform and equitable methods are developed for determining jurisdiction to tax and for dividing the tax base among States.
 
 (Emphasis supplied.)
 

 "(c) With respect to any taxable year or other taxable period beginning on or after the date of enactment of this section [August 16,1973] and before January 1,1976, no State or political subdivision thereof may impose any tax measured by income or receipts or any other 'doing business’ tax on any insured depository not having its principal office within such State.”
 

 In its income tax return for 1974, plaintiff had stated: "In accordance with Public Law 93-100, the company has no taxable income in the State of Oregon.” Without setting out its legal reasoning, the defendant department’s opinion concluded that the federal government exceeded its constitutional authority in enacting Public Law 93-100 and found it to be unconstitutional. The defendant department’s order held that the plaintiff was liable for income taxes for that year in the sum of $242,394, plus interest.
 

 The facts having been stipulated, the suit was submitted on briefs and exhibits and oral argument. The sole issue presented is: Does Congress have the constitutional authority to enact a statute which imposes a temporary moratorium on state income taxation of a federal savings and loan association (an "insured depository”) which does not have its principal office within the taxing state?
 

 Exhibits attached to the Plaintiff’s Reply Brief (filed in this court on November 23,1979), as to which the court takes judicial notice, give some insight into the reasons for passage by the U. S. Congress of Public Law 93-100, section 7(b). Taken in chronological order, the first is a report to the Committee on Banking, Housing and Urban Affairs, United States Senate, entitled "State and Local Taxation of Banks,” a report prepared by the Board of Governors of the Federal
 
 *[469]
 
 Reserve System, published in May 1971 (see App B, PI Rep Br). A recommendation made by the Federal Reserve (page 4 of its report), relating to taxation by states other than the state of the principal office, seeks to limit the circumstances in which national banks and other depository institutions may be subject to state or local government taxes on or measured by net income, and to prescribe rules for such taxation. Apparently, one of the fears of the Federal Reserve Board was that the home state might be required to divide the tax base of its domiciliary banks with other states or, on the other hand, it might acquire jurisdiction over part of the tax base of nondomiciliary banks. As stated in the report:
 

 "With interstate division of the tax base, assurances are needed that the sum of the taxable base on which two or more States levy taxes will not exceed 100 percent of the actual base. But even where this limit is not exceeded, serious burdens may result when two or more States claiming jurisdiction to tax, for example, the same net income, use different rules for interstate division of the tax base and require different kinds of records and reports.
 

 "If interstate division of the taxable net income of banks were to conform closely to procedures currently applied to other businesses by most States, there would be—with present lending practices—comparatively little allocation or apportionment of the tax base to States other than the home State of the banks. However, if all restrictions on taxing out-of-State institutions were removed, States could be expected to modify their allocation procedures so as to apply their levies to an increasing proportion of the tax base of out-of-State banks. This could involve the introduction of new division-of-base measures tailored particularly to financial intermediaries.”
 

 The next item which explains the enactment of Public Law 93-100 is Senate Report (Banking, Housing and Urban Affairs Committee) No. 93-149, May 14, 1973 (App A, PI Rep Br). It states (on page 2020):
 

 "Taxation of the transactions of out-of-State de
 
 *[470]
 
 positories raises a number of difficult legal questions as well as operating and administrative problems.
 

 "If an individual State decides to impose a 'doing business’ tax and other neighboring States do not, this will tend to cause lendable funds to dry up in the taxing State. There is also the danger in multi-State tax situations of a tax base exceeding 100%. But even where this limit is not exceeded, serious problems may result when two or more States claiming jurisdiction to tax use different rules and require different kinds of reports and records.
 

 "The Committee believes that the Advisory Commission on Intergovernmental Relations is eminently qualified to assume this task [of study and preparation of recommendations to Congress] since the Commission members include Federal Executive and Legislative Branch representatives, State legislators and State and local executives.”
 

 The report quotes a letter from Rep. Ralph Turling-ton, Chairman, Government Operations Task Force, dated April 16, 1973, which includes the following:
 

 "One further objective of the bill is to render an exemption to these institutions [federally insured depositories] from the payment of either a state income or franchise tax in a State, other than the State where its principal office is located, even though these same institutions are doing business, or earning income, in those States. While we oppose such favored treatment, we do feel that some ground rules dealing with apportionment of taxable financial institutions income between States is certainly worthy of development. In this regard, the Government Operations Task Force of the National Legislative Conference feels that
 
 a brief moratorium on the interstate taxation of federally insured depositories is in order,
 
 during which time a fair and equitable apportionment formula can be agreed upon. Because of the representation of the States on the Advisory Commission on Intergovernmental Relations, we feel that ACER would be the proper institution to develop recommendations concerning equitable state taxation of out-of-state commercial banks, mutual savings banks, and savings and loan associations and other matters relating to the question of multi-states taxation. * * *” (Emphasis supplied.)
 

 
 *[471]
 
 A study and report was made by the Advisory Commission on Intergovernmental Relations to the Committee on Banking, Housing and Urban Affairs, United States Senate, in May 1975 (supplemented September 1975), entitled "State and Local 'Doing Business’ Taxes on Out-of-State Financial Depositories, Report of a Study in Public Law 93-100.” Respecting Public Law 93-100, sec. 7, the ACIR stated at page 485 (App C, PI Rep Br):
 

 "One of the most preemptive of approaches to the question of Federal intervention would be congressional action prohibiting taxation of depositories by any State other them the State of corporate domicile. * * *”
 

 The next pages of the report refer to many complicating factors which must be considered if the moratorium were made permanent and then concludes (at 487):
 

 «* * * But it would require a degree of congressional intervention in State policies and fiscal claims which many States could be expected to oppose.”
 

 The ACIR gave no thought as to the congressional power to establish a moratorium but, after its report was received, the Congress did nothing more and allowed Public Law 93-100 to expire, pursuant to its own time limitation.
 

 The several briefs presented to the court by counsel are evidence of assiduous study of the question presented, but no judicial decisions have been offered which are squarely in point with the issue; i.e., the constitutionálity of the use of a moratorium within the facts of this suit. There is no question but that the Homeowners’ Loan Corporation is a federal instrumentality
 
 [1]
 
 and that the federal savings and loan association is a "creature” of that corporation. The preponderance of the authority would indicate that it, too, is a "fed
 
 *[472]
 
 eral instrumentality.”
 
 {See
 
 PI Supp Memo, filed 2-25-80, and cases cited therein.) However, the United States Supreme Court has made clear that the several states can impose taxes upon a federal instrumentality as long as they act in a nondiscriminatory fashion.
 
 First Federal Savings & Loan v. Mass. Tax Comm’n,
 
 437 US 255, 98 S Ct 2333, 57 L Ed2d 187 (1978). Plaintiff agrees that the tax applied by ORS chapter 318 is nondiscriminatory.
 
 [2]
 

 The recommendations to the Congress made by the Federal Reserve Board, and the reports of the congressional committees cited and quoted above, indicate that, at the time of their publication, an apparently bona fide question had been raised as to the possibility of discrimination by the states in the taxation of branches of federal savings and loan associations in a given state (the principal office of such "insured depository” being located in another state). Nothing has been brought to the court’s attention that would suggest that this question was without foundation and was arbitrarily seized upon by the Congress to wrest taxing power from a sovereign state.
 

 The question having been raised in the Congress, study thereof was required. Study takes time. The Congress could have allowed the continuation of the status quo while necessary study was being made. If it reasonably appeared,
 
 ab initio,
 
 that there was significant danger that improper impositions could be made by some state or states, affecting the flow of loan money from federal banking establishments, the Con
 
 *[473]
 
 gress could certainly follow its own judgment in determining that a relatively brief moratorium should be utilized, pending conclusion of studies. Nothing has been shown in this suit that Congress acted unfairly.
 

 The authority of Congress to enact a moratorium under the facts set out above, relating to a class of federal banking institutions, denominated for convenience as "insured depositories,” in order to develop a uniform and equitable taxing system, although temporarily detrimental to the revenues of a particular state, seems clearly to come within the provisions of the U. S. Const., art VI, cl 2:
 

 "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.”
 

 The Supremacy Clause appears to this date to contain more power than the Tenth Amendment.
 
 MCulloch v. Maryland, 17 US
 
 (4 Wheat) 316, 4 L Ed 579 (1819), has not yet weathered away. John Marshall, C.J., stated therein:
 

 "This government is acknowledged by all to be one of enumerated powers. The principle, that it can exercise only the powers granted to it, would seem too apparent to have required to be enforced by all those arguments which its enlightened friends, while it was depending before the people, found it necessary to urge. That principle is now universally admitted. But the question respecting the extent of the powers actually granted, is perpetually arising, and will probably continue to arise, as long as our system shall exist.
 

 "In discussing these questions, the conflicting powers of the general and state governments must be brought into view, and the supremacy of their respective laws, when they are in opposition, must be settled.
 

 "If any one proposition could command the universal assent of mankind, we might expect it would be this— that the government of the Union, though limited in its powers, is supreme within its sphere of action. * * *” (17 US (4 Wheat) 316, 405, 4 L Ed 579, 601 (1819).)
 

 
 *[474]
 

 M’Culloch v. Maryland
 
 specifically established the power of the federal government to create such system of banks as might be found necessary for the administration of federal powers stated in the U. S. Constitution, although "banking” is not specifically referred to in that document.
 

 Conflicting state law and policy must yield to the federal statute and policy. Although constant attacks have been made by the states (and must ever continue) in order to determine the extent or limitations of federal power, a nationally known commentator, Edward S. Corwin, has concluded:
 

 "But Congress is still able, by virtue of the necessary and proper and supremacy clauses in conjunction, to exempt instrumentalities of the National Government, or private gains therefrom, from State or local taxation; but any person, natural or corporate, claiming such an exemption must ordinarily be able to point to an explicit stipulation by Congress to that effect. Moreover, Congress is always free to waive such exemptions when it can do so without breach of contract, and any such waiver will generally be liberally construed by the Court in favor of the taxing authority.” (Corwin,
 
 The Constitution and What It Means Today
 
 227 (1973 ed).)
 

 The Tenth Amendment, although subordinate to the Supremacy Clause, still has its uses, as is illustrated by
 
 National League of Cities v. Usery;
 
 426 US 833, 96 S Ct 2465, 49 L Ed2d 245 (1976), but the issue involved in that case is in sharp contrast to the situation which confronts the court in the present suit.
 
 [3]
 
 It must constantly be held in mind that the issue before this court deals only with the congressional power to provide by statute a brief moratorium which
 
 *[475]
 
 affects a very limited number of federal savings and loan associations,
 
 [4]
 
 one of which is doing business in Oregon. The federal act does not seek to impose immediately upon the state some discriminatory tax which favors the federal tax system in comparison to the state’s system. The act merely provides time to make inquiry into questions relating to the possibility of discrimination by states in the taxing of a federal instrumentality. So far as the record in this proceeding shows, the questions were relevant and bona fide.
 
 [5]
 

 The court recognizes that a federal measure creating a moratorium is the exercise of a power which can easily be abused.
 
 [6]
 
 However, it is the duty of Congress to set policy and to enact statutes in support thereof. A moratorium, by its very nature, is in derogation of these requirements. A moratorium is a "freezing”; an inaction or a nonaction. But it has its uses and justification. Its use can be analogous to the "stay” of collection of taxes which can be issued in the discretion of the judge of this tax court, when a substantial public interest requires, pursuant to ORS 305.565. The moratorium was so used in Public Law 93-100, sec. 7(c).
 

 The defendant erred in its determination that the federal Public Law 93-100, sec. 7, was unconstitutional. Its action was premature. Defendant’s Order
 
 *[476]
 
 I 79-40 must be set aside and held for naught. Plaintiff is not required to pay corporation income taxes to Oregon for the tax year 1974. Plaintiff is entitled to its statutory costs and disbursements.
 

 [1]
 

 Laurens F.S. & L. v. South Carolina Tax Comm.,
 
 365 US 517, 81 S Ct 719, 5 L Ed2d 749 (1961);
 
 Pittman v. Home Owners’ Loan Corp. of Wash., D.C.,
 
 308 US 21, 60 S Ct 15, 84 L Ed 11 (1939).
 

 [2]
 

 This court recognizes that federal savings and loan associations are privately owned corporations seeking private profit. They perform few, if any, functions which differ from the usual, regular performance and procedures of a state savings and loan association. The court is impressed by Justice Thurgood Marshall’s dissent in
 
 Agric. Nat. Bank v. Tax Commission,
 
 392 US 339, 88 S Ct 2173, 20 L Ed2d 1138 (1968), in which he wrote that the fact that institutions owe their existence to (are chartered by) the federal government must be rejected as a basis for tax immunity at the state and local level. The real issue, he observed, is that any tax imposed must be nondiscriminatory in its effect on all persons within the properly prescribed classification which is subjected to the tax.
 

 [3]
 

 In
 
 Usery,
 
 the U. S. Supreme Court found the federal Pair Labor Standards Act had been amended in 1974 to require all states and their political subdivisions to apply the Act’s minimum wage and maximum hour provisions to almost all state and local government employees. This amendment was deemed to exceed the powers of Congress and was stricken. (The case is useful in illustrating the continuing problem of interpretation to which Chief Justice John Marshall alluded, as quoted on page 473 of this opinion. In contrast,
 
 see
 
 the recent decision in
 
 Arizona Public Service Co. v. Snead,
 
 441 US 141, 99 S Ct 1629, 60 L Ed2d 106 (1979).)
 

 [4]
 

 See
 
 PI Rep Br 10, quoting the ACER, report.
 

 [5]
 

 The court does not overlook the revenue lost to the state during the moratorium ($242,394 in 1974). In Congress, such a sum is probably deemed insignificant. Even in Oregon, where parsimony in government is the rule, that sum represents only 0.0024 percent of the revenue received by the state under ORS chapter 318 in 1974 ($102,338,535). (Source: Dept, of Rev. Monthly Receipts and Distribution Reports to the Legislative Revenue Office.)
 

 [6]
 

 See
 
 the history of federal Public Law 86-272 (72 Stat 555), limiting the states’ nondiscriminatory income taxation of interstate corporations. This measure, enacted as a temporary statute on September 14, 1959, still continues in effect, pending further congressional action.
 

 Consider also the tax and record-keeping problems engendered by two ■ congressional postponements of "carry-over” bases under the federal inheritance tax laws for most property acquired from a decedent. ERC (1954), §§ 1016(c), 1040 and 2614(a). PL 96-223, § 401(a) (4-2-80); PL 94-455 (10-4-78).