Argued and submitted October 6, 1981, affirmed May 19, 1982

## PACIFIC FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION,
*Respondent,*

*v.*

## DEPARTMENT OF REVENUE,
*Appellant.*

(TC 1359, SC 27631)

645 P2d 27

Carlisle B. Roberts, Judge.

Theodore W. de Looze, Chief Counsel, Tax Division, Salem, argued the cause for appellant. With him on the briefs was Dave Frohnmayer, Attorney General, Salem.

Jeffrey E. Boly, Portland, argued the cause and filed the brief for respondent.

William D. Dexter, General Counsel, Tumwater, Washington, filed the brief amicus curiae and argued the cause on rebuttal for Multistate Tax Commission.

Before Denecke, Chief Justice, and Lent, Linde, Peterson, Tanzer and Campbell, Justices.

DENECKE, C. J.

## DENECKE, C. J.

The Oregon Department of Revenue seeks to have held unconstitutional an Act of Congress exempting the plaintiff taxpayer and other similar concerns from any "doing business" state tax, which would include the Oregon corporate excise tax. The Department contends the Act is beyond the powers granted to Congress.

The taxpayer is a savings and loan association chartered under the federal Homeowners' Loan Act of 1933 (12 USC 1461(h)). Its accounts are insured by the Federal Savings and Loan Insurance Corporation. The Association's principal office is in the State of Washington and it has four branch offices in Oregon. It filed a 1974 Oregon corporate excise tax return with the defendant stating that pursuant to Public Law 93-100, 87 Stat 347 (1973), it earned no taxable income in Oregon. The Department assessed a deficiency against the taxpayer and issued an order that Public Law 93-100 exceeded the authority of Congress. The taxpayer appealed to the Tax Court which upheld the Act. 8 OTR 466 (1980). We affirm.

Public Law 93-100 provided that Congress found, "* * * fostering an efficient banking system and the free flow of commerce among the State will be furthered by clarifying the principles governing State taxation of interstate transactions of banks and other depositories." For this reason it decided that "doing business" taxes imposed by states on depositories having their principal offices in other states should be deferred until equitable methods are developed to determine jurisdiction to tax. Congress, therefore, declared that for three years no state could impose a "doing business" tax "on any insured depository not having its principal office within such State." [1]

---

[1]

"(a) This section may be cited as the 'State Taxation of Depositories Act.'

"(b) The Congress finds that the national goals of fostering an efficient banking system and the free flow of commerce among the States will be furthered by clarifying the principles governing State taxation of interstate transactions of banks and other depositories. Application of taxes measured by income or receipts, or other 'doing business' taxes, in States other than the States in which depositories have their principal offices should be deferred until such time as uniform and equitable methods are developed for determining jurisdiction to tax and for dividing the tax base among States.

The taxpayer contends Congress was empowered to act either under its admitted power to exempt "federal instrumentalities" from state taxation *(M'Culloch v. Maryland,* 17 US 421 [4 Wheat 316] [1819]) or under its power "to regulate Commerce * * * among the several States * * *." Art I, § 8, Constitution of the United States. We hold Congress was empowered to act by the Commerce Clause.

The state and the Multistate Tax Commission, which supported the Department's position, make several arguments: The exemption is not a regulation of interstate commerce but if it should be so considered, the federal government's interest in preventing any possibility of a state interfering with interstate commerce is outweighed by the state's imperative need to tax; that if Congress did have a legitimate concern about the flow of interstate commerce, it was confined to national banks and not federally chartered savings and loan associations; a moratorium on state taxation is not a means "reasonably adapted" to the end permitted by the Constitution; that is, freeing the flow of commerce. *Heart of Atlanta Motel v. United States,* 379 US 241, 85 S Ct 348, 13 L Ed2d 258, 271 (1964).

We start with some basic concepts that are not disputed. The power of Congress delegated by the Commerce Clause is plenary; it is, "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution." *Gibbons v. Ogden,* 22 US (9 Wheat) 1 (1824). That power not only applies to persons or things in commerce but to "activities affecting commerce." *United States v. Darby,* 312 US 100, 61 S Ct 451, 85 L Ed 609, 185 ALR 1430 (1941); *Fry v. United States,* 421 US 524, 95 S Ct 1792, 44 L Ed2d 363 (1975). If Congress finds or states that a particular activity is in commerce or affects commerce, the courts must accept that determination if there is any rational

---

"(c) With respect to any taxable year or other taxable period beginning on or after the date of enactment of this section and before January 1, 1976, no State or political subdivision thereof may impose any tax measure by income or receipts or any other 'doing business' tax on any insured depository not having its principal office within such State.

"* * * * *."

basis for the determination. *Katzenbach v. McClung,* 379 US 294, 85 S Ct 377, 13 L Ed2d 290, 297-298 (1964); *Hodel v. Virginia Surface Mining & Recl. Assn.,* 452 US 264, 101 S Ct 2352, 69 L Ed2d 1, 15 (1981).

In the statute in issue, Congress stated: "[T]he free flow of commerce among the States will be furthered by clarifying the principles governing State taxation of interstate transactions of banks * * *." The legislative history of the statute here in question shows Congress's concern that state taxation could unduly interfere with the interstate commerce conducted by depositories, including savings and loan associations, as well as national banks. A report prepared by the Board of Governors of the Federal Reserve System entitled, "State and Local Taxation of Banks" (1971), states:

"With interstate division of the tax base, assurances are needed that the sum of the taxable base on which two or more States levy taxes will not exceed 100 percent of the actual base. But even where this limit is not exceeded, serious burdens may result when two or more States claiming jurisdiction to tax, for example, the same net income, use different rules for interstate division of the tax base and require different kinds of records and reports."

Senate Report (Banking, Housing and Urban Affairs Committee) No. 93-149, May 14, 1973, quotes a letter from Rep. Ralph Turlington, Chairman, Government Operations Task Force, dated April 16, 1973, as follows:

"* * * Because of the representation of the States on the Advisory Commission on Intergovernmental Relations, we feel that ACIR would be the proper institution to develop recommendations concerning equitable state taxation of out-of-state commercial banks, mutual savings banks, and savings and loan associations and other matters relating to the question of multi-states taxation. * * *."

We also conclude that there is a "rational basis" for Congress to believe that states' "doing business" taxes levied on concerns such as the plaintiff taxpayer are on activities in interstate commerce or activities affecting interstate commerce. The exemption only applies to the taxing of depositories which have their principal office in another state. It is rational to conclude that this spatial arrangement probably would involve or affect transactions and the flow of property across state lines.

The Department relies heavily upon *National League of Cities v. Usery,* 426 US 833, 96 S Ct 2465, 49 L Ed2d 245 (1976). This was the first decision in 40 years to hold a congressional regulation of commerce to be an invalid encroachment upon the sovereignty of state or local government. In *Usery,* the court held invalid amendments to the Fair Labor Standards Act which extended the minimum wage and maximum hours provision to employees of state and city government. The Court so held because of its conclusion that in fixing minimum wages and maximum hours for persons performing services the state and local governments traditionally provided, the federal government was interfering with " 'functions essential to separate and independent existence' " of the states and their subdivisions. 426 US at 845.

The reach of *National League of Cities* was uncertain. For examples, see Tribe, American Constitutional Law, § 5-22 (1978); Lockhart, Kamisar & Choper, Constitutional Law (5th ed 1980), 188, 191. Two recent United States Supreme Court cases now have outlined the perimeter of the principle of the *National League of Cities* opinion.

*Hodel v. Virginia Surface Mining & Recl. Assn.,* *supra,* concerned the validity of the federal Surface Mining Control and Reclamation Act of 1977. The United States District court had relied upon *National League of Cities* and held the Surface Mining Act invalid because "it concluded that the Act contravenes the Tenth Amendment because it interferes with the States' 'traditional governmental function' of regulating land use." 452 US at 284-85.

The Supreme Court held that in enacting the Act, Congress was validly acting within its power to regulate commerce. The Court stated the scope of *National League of Cities.*

"It should be apparent from this discussion that in order to succeed, a claim that congressional commerce power legislation is invalid under the reasoning of National League of Cities must satisfy each of three requirements. First, there must be a showing that the challenged statute regulates the 'States as States.' *Id.,* at 854. Second,

the federal regulation must address matters that are indisputably 'attributes of state sovereignty.' *Id.*, at 845. And third, it must be apparent that the States' compliance with the federal law would directly impair their ability 'to structure integral operations in areas of traditional functions.' *Id.*, at 852. 452 US at 287-88. * * *."

The *Surface Mining* law was held not within the ambit of *National League of Cities* because the law did not come within the first of the above-quoted requirements; that is, did not regulate the "States as States."

In the second Supreme Court case, the first requirement was satisfied, but the statute was nevertheless held valid. In *Transportation Union v. Long Island R. Co.*, 455 US 678, 102 S Ct 1349, 71 L Ed2d 1349 (1982), the issue was "* * * whether the Tenth Amendment prohibits application of the Railway Labor Act to a state-owned railroad engaged in interstate commerce." 455 US at 680. The Court held: "It is thus clear that operation of a railroad engaged in interstate commerce is not an integral part of traditional state activities generally immune from federal regulation under *National League of Cities*." 455 US at 685.

These three cases, and the "three requirements" stated in *Hodel v. Virginia Surface Mining & Recl. Assn.*, *supra*, we now understand to be applicable to situations in which the federal government, acting pursuant to the commerce power, is attempting to regulate the managerial and operational aspects of state government. In *Usery, supra*, it was the wages and hours of state employees; in *Transportation Union*, it was the labor relations of state employees; and in *Hodel*, it was the regulation of private operators of strip mines. Presumably the principles of these cases would apply to the wages and hours and labor relations in state tax departments as well as in other traditional state government operations. But the power of Congress to regulate interstate commerce by immunizing some of it from state taxation raises entirely different issues. *Usery, Hodel* and *Transportation Union* are not applicable to those issues.

More applicable is our decision in *Smith Kline & French v. Tax Com.*, 241 Or 50, 403 P2d 375 (1965). The

predecessor of the Oregon Department of Revenue contended that a federal statute regulating the state's taxing the income of concerns conducting business involving interstate commerce was beyond Congress's power to regulate commerce. We held the act was valid the stated: "* * * [W]e are convinced * * * that the congressional power over the taxation of the revenues of interstate commerce is supreme." 241 Or at 61, n 2.

As regards the argument that the means adopted by Congress is not "reasonably adapted" to freeing the flow of commerce; providing for a tax moratorium while Congress seeks a solution to state taxation which impedes the flow of commerce is "reasonably adapted."

Affirmed.