UNITED TRANSPORTATION UNION *v.* LONG ISLAND
RAIL ROAD CO. ET AL.

No. 80–1925.   Argued January 20, 1982—Decided March 24, 1982

BURGER, C. J., delivered the opinion for a unanimous Court.

*Edward D. Friedman* argued the cause for petitioner. With him on the briefs were *Robert Hart* and *Harold A. Ross.*

*Lewis B. Kaden* argued the cause for respondents. With him on the brief were *Mary P. Bass* and *Thomas M. Taranto.*

*Joshua I. Schwartz* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Deputy Solicitor General Geller, T. Timothy Ryan, Jr., Lois G. Williams, Joseph Woodward,* and *Ronald M. Etters.**

---

*\*J. Albert Woll, Laurence Gold,* and *George Kaufmann* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *William T. Coleman, Jr., Donald T. Bliss,* and *Zoë E. Baird* for the American Public Transit Association; by *Henry W. Underhill, Jr., Benjamin L. Brown, John Dekker, James B. Brennan, George Agnost, Roger F. Cutler, Lee E. Holt, George F. Knox, Jr., Walter M. Powell, Allen G. Schwartz, J. Lamar Shelley, John W. Witt, Max P. Zall, Conard B. Mattox, Jr.,* and

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether the Tenth Amendment prohibits application of the Railway Labor Act to a state-owned railroad engaged in interstate commerce.

I

The Long Island Rail Road (the Railroad), incorporated in 1834, provides both freight and passenger service to Long Island.[1] In 1966, after 132 years of private ownership and a period of steadily growing operating deficits, the Railroad was acquired by New York State through the Metropolitan Transportation Authority.

Thereafter, the Railroad continued to conduct collective bargaining pursuant to the procedures of the Railway Labor Act. 44 Stat. (part 2) 577, as amended, 45 U. S. C. § 151 *et seq.* The United Transportation Union, petitioner in this case, represents the Railroad's conductors, brakemen, switchmen, firemen, motormen, collectors, and related train crew employees. In 1978, the Union notified the Railroad that it desired to commence negotiations and the parties began collective bargaining as provided by the Act. They failed to reach agreement during preliminary negotiations

*Charles S. Rhyne* for the National Institute of Municipal Law Officers; and by *Ross D. Davis* for the National League of Cities.

*Martin L. Barr, Jerome Thier,* and *Anthony Cagliostro* filed a brief for the New York State Public Employment Relations Board as *amicus curiae.*

[1] The Railroad's western terminus is Pennsylvania Station in Manhattan; there it connects with lines of railroads which serve other parts of the country. The eastern terminus is at Montauk Point, at the tip of Long Island, but most of its main and branch line traffic originates in the western half of Long Island, in the boroughs of Brooklyn and Queens, and in the suburbs of Nassau and western Suffolk Counties. By far the bulk of the Railroad's business is carrying commuters between Long Island's suburban communities and their places of employment in New York City. However, the Railroad supplies Long Island's only freight service; it does a significant volume of freight business, with 1979 freight revenue of over $12 million.

and, in April 1979, the Railroad and the Union jointly petitioned the National Mediation Board for assistance. Seven months of mediation efforts by the Board failed to produce agreement, however, and the Board released the case from mediation. This triggered a 30-day cooling-off period under the Act; absent Presidential intervention, the Act permits the parties to resort to economic weapons, including strikes, upon the expiration of the cooling-off period.

The Union anticipated the State's challenge to the applicability of the Act to the Railroad; on December 7, 1979, one day before the expiration of the 30-day cooling-off period, it sued in federal court seeking a declaratory judgment that the dispute was covered by the Railway Labor Act and not the Taylor Law, New York's law governing public employee collective bargaining and prohibiting strikes by public employees.[2] The next day, the Union commenced what was to be a brief strike. Pursuant to the Act, the President of the United States intervened on December 14, thus imposing an additional 60-day cooling-off period which was to expire on February 13, 1980.[3] A few days before the expiration of the 60-day period, the State converted the Railroad from a private stock corporation to a public benefit corporation, apparently believing that the change would eliminate Railway Labor Act coverage and bring the employees under the umbrella of the Taylor Law.

The Railroad then filed suit in state court on February 13, 1980, seeking to enjoin the impending strike under the Taylor Law. Before the state court acted, the United States District Court for the Eastern District of New York heard and decided the Union's suit for declaratory relief, holding that the Railroad was a carrier subject to the Railway Labor Act,

---

[2] On January 17, 1980, the Railroad responded to the Union's suit for declaratory judgment by asserting that no justiciable controversy existed because the Railroad did not believe the Taylor Law applied and therefore had no intention to invoke its provisions.

[3] The Presidential intervention also triggered the creation of a Presidential Emergency Board to investigate and report on the matter.

that the Act, rather than the Taylor Law, was applicable, and that declaratory relief was in order. 509 F. Supp. 1300 (1980).

In a footnote the District Court rejected the argument now presented to this Court that application of the Act to a state-owned railroad was inconsistent with *National League of Cities* v. *Usery*, 426 U. S. 833 (1976). 509 F. Supp., at 1306, n. 4. The District Court noted that in *National League of Cities*, the Supreme Court "specifically held that the operation of a railroad in interstate commerce is not an integral part of governmental activity" and affirmed the rulings in *California* v. *Taylor*, 353 U. S. 553 (1957), and *United States* v. *California*, 297 U. S. 175 (1936), which held that the Railway Labor Act and the Safety Appliance Act could be applied to state-owned railroads. 509 F. Supp., at 1306, n. 4.

The Court of Appeals reversed, holding that the operation of the Railroad was an integral state governmental function and that the federal Act displaced "essential governmental decisions" involving that function. 634 F. 2d 19 (CA2 1980). The court applied a balancing approach and held that the State's interest in controlling the operation of its railroad outweighed the federal interest in having the federal Act apply.

We granted certiorari, 452 U. S. 960 (1981), and we reverse.

## II

There can be no serious question that, as both the District Court and the Court of Appeals held, the Railroad is subject to the terms of the Railway Labor Act,[4] or that the Com-

---

[4] The Railroad acknowledges in its brief that its freight service, which is admittedly engaged in interstate commerce, "eliminat[es] any dispute regarding its coverage by the RLA." Brief for Respondents 23.

In the Court of Appeals, the Railroad maintained that Congress did not intend the Act to apply to state-owned passenger railroads. 634 F. 2d, at 23. Whatever merit that claim may have had, it is no longer tenable. After that court rendered its decision, Congress amended the Act to add § 9a, 95 Stat. 681, 45 U. S. C. § 159a (1976 ed., Supp. V). Section 9a

merce Clause grants Congress the plenary authority to regulate labor relations in the railroad industry in general.[5] This dispute concerns the application of this acknowledged congressional authority to a state-owned railroad; we must decide whether that application so impairs the ability of the State to carry out its constitutionally preserved sovereign function as to come into conflict with the Tenth Amendment.[6]

## A

The Railroad claims immunity from the Railway Labor Act, relying on *National League of Cities* v. *Usery, supra,* where we held that Congress could not impose the requirements of the Fair Labor Standards Act on state and local governments.[7] The Fair Labor Standards Act generally requires covered employers to pay employees no less than a minimum hourly wage and to pay them at one and one-half times their regular hourly rate for all time worked in any workweek in excess of 40 hours. Prior to 1974, the Act excluded most governmental employers. However in that year Congress amended the law to extend its provisions in somewhat modified form to "public agencies," including state governments and their political subdivisions.[8] We held that the 1974 amendments were invalid "insofar as [they] operate to directly displace the States' freedom to structure integral operations in areas of *traditional governmental functions . . . .*" 426 U. S., at 852. (Emphasis supplied.)

_____

establishes special procedures to be applied to any dispute "between a publicly funded and publicly operated carrier providing rail commuter service . . . and its employees."

[5] See *Texas & N. O. R. Co.* v. *Railway & Steamship Clerks,* 281 U. S. 548 (1930).

[6] The Tenth Amendment provides:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

[7] The Fair Labor Standards Act is codified at 29 U. S. C. § 201 *et seq.*

[8] 88 Stat. 55. The 1974 amendments modified several of the definitions contained in 29 U. S. C. § 203.

Only recently we had occasion to apply the *National League of Cities* doctrine in *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264 (1981). In holding that the Surface Mining and Reclamation Act of 1977, 30 U. S. C. § 1201 *et seq.* (1976 ed., Supp. IV), did not violate the Tenth Amendment by usurping state authority over land-use regulations, we set out a three-prong test to be applied in evaluating claims under *National League of Cities:*

> "[I]n order to succeed, a claim that congressional commerce power legislation is invalid under the reasoning of *National League of Cities* must satisfy *each* of three requirements. First, there must be a showing that the challenged regulation regulates the 'States as States.' [426 U. S.], at 854. Second, the federal regulation must address matters that are indisputably 'attributes of state sovereignty.' *Id.*, at 845. And third, it must be apparent that the States' compliance with the federal law would directly impair their ability 'to structure integral operations in areas of traditional governmental functions.' *Id.*, at 852." 452 U. S., at 287–288.[9]

The key prong of the *National League of Cities* test applicable to this case is the third one, which examines whether "the States' compliance with the federal law would directly impair their ability 'to structure integral operations in areas of traditional governmental functions.'"

## B

The determination of whether a federal law impairs a state's authority with respect to "areas of traditional [state] functions" may at times be a difficult one. In this case, however, we do not write on a clean slate. As the District Court

---

[9] However, even if these three requirements are met, the federal statute is not automatically unconstitutional under the Tenth Amendment. The federal interest may still be so great as to "justif[y] state submission." 452 U. S., at 288, n. 29. Cf. *Case* v. *Bowles*, 327 U. S. 92 (1946).

noted, in *National League of Cities* we explicitly reaffirmed our holding in *United States* v. *California*, 297 U. S. 175 (1936), and in two other cases involving federal regulation of railroads:[10]

> "The holding of *United States* v. *California* . . . is quite consistent with our holding today. There California's activity to which the congressional command was directed was not in an area that the States have regarded as integral parts of their governmental activities. It was, on the contrary, the operation of a railroad engaged in 'common carriage by rail in interstate commerce . . . .' 297 U. S., at 182." 426 U. S., at 854, n. 18.

It is thus clear that operation of a railroad engaged in interstate commerce is not an integral part of traditional state activities generally immune from federal regulation under *National League of Cities*. See also *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 422–424 (1978) (concurring opinion).[11] The Long Island is concededly a railroad engaged in interstate commerce.

The Court of Appeals undertook to distinguish the three railroad cases discussed in *National League of Cities*, noting

---

[10] *Parden* v. *Terminal R. Co.*, 377 U. S. 184 (1964); *California* v. *Taylor*, 353 U. S. 553 (1957).

[11] "[T]here [is] certainly no question that a State's operation of a common carrier, even without profit and as a 'public function,' would be subject to federal regulation under the Commerce Clause. . . .

.       .       .       .       .

"The *National League of Cities* opinion focused its delineation of the 'attributes of sovereignty' . . . on a determination as to whether the State's interest involved 'functions essential to separate and independent existence.' [426 U. S., at 845], quoting *Coyle* v. *Oklahoma*, 221 U. S. 559, 580 (1911). It should be evident, I would think, that the running of a business enterprise is not an integral operation in the area of traditional government functions. . . . Indeed, the reaffirmance of the holding in *United States* v. *California, supra*, by *National League of Cities, supra*, at 854, n. 18, strongly supports this understanding." 435 U. S., at 422–424 (BURGER, C. J., concurring in part and in judgment).

that they dealt with freight carriers rather than primarily passenger railroads such as the Long Island. That distinction does not warrant a different result, however. Operation of passenger railroads, no less than operation of freight railroads, has traditionally been a function of private industry, not state or local governments.[12] It is certainly true that some passenger railroads have come under state control in recent years, as have several freight lines, but that does not alter the historical reality that the operation of railroads is not among the functions *traditionally* performed by state and local governments. Federal regulation of state-owned railroads simply does not impair a state's ability to function as a state.

## III

In concluding that the operation of a passenger railroad is not among those governmental functions generally immune from federal regulation under *National League of Cities*, we are not merely following dicta of that decision or looking only to the past to determine what is "traditional." In essence, *National League of Cities* held that under most circumstances federal power to regulate commerce could not be exercised in such a manner as to undermine the role of the states in our federal system. This Court's emphasis on traditional governmental functions and traditional aspects of state sovereignty was not meant to impose a static historical view of state functions generally immune from federal regulation. Rather it was meant to require an inquiry into whether the federal regulation affects basic state preroga-

---

[12] At the time of this suit, there were 17 commuter railroads in the United States; only 2 of those railroads were publicly owned and operated, both by the Metropolitan Transportation Authority. American Public Transit Assn., Transit Fact Book 74–75 (1979). Those two public railroads—the Long Island and the Staten Island—were originally private railroads. The Staten Island was founded in 1899 and acquired by the Metropolitan Transportation Authority in 1971. Moody's Transportation Manual 97 (1979).

tives in such a way as would be likely to hamper the state government's ability to fulfill its role in the Union and endanger its "separate and independent existence." 426 U. S., at 851.

Just as the Federal Government cannot usurp traditional state functions, there is no justification for a rule which would allow the states, by acquiring functions previously performed by the private sector, to erode federal authority in areas traditionally subject to federal statutory regulation. Railroads have been subject to comprehensive federal regulation for nearly a century.[13] The Interstate Commerce Act—the first comprehensive federal regulation of the industry—was passed in 1887.[14] A year earlier we had held that only the Federal Government, not the states, could regulate the interstate rates of railroads. *Wabash, St. L. & P. R.* Co. v. *Illinois*, 118 U. S. 557 (1886). The first federal statute dealing with railroad labor relations was the Arbitration Act of 1888;[15] the provisions of that Act were invoked by President Cleveland in reaction to the Pullman strike of 1894. Federal mediation of railroad labor disputes was first provided by the Erdman Act of 1898[16] and strengthened by the Newlands Act of 1913.[17] In 1916, Congress mandated the 8-hour day in the railroad industry.[18] After federal operation of the railroads during World War I, Congress passed the Transportation Act of 1920,[19] which further enhanced federal involvement in

---

[13] The initial exercise of the federal authority over railroads occurred before the completion of the first transcontinental railroad. See the Pacific Railroad Act of 1862. 12 Stat. 489. Of course, federal regulation of interstate transportation goes back many more years than that. See the 1793 Act regulating coastal trade discussed in *Gibbons* v. *Ogden*, 9 Wheat. 1 (1824).

[14] 24 Stat. 379.

[15] Ch. 1063, 25 Stat. 501.

[16] 30 Stat. 424.

[17] Ch. 6, 38 Stat. 103.

[18] Adamson Act of 1916, ch. 436, 39 Stat. 721.

[19] 41 Stat. 456.

railroad labor relations. Finally, in 1926, Congress passed the Railway Labor Act, which was jointly drafted by representatives of the railroads and the railroad unions.[20] The Act has been amended a number of times since 1926, but its basic structure has remained intact. The Railway Labor Act thus has provided the framework for collective bargaining between all interstate railroads and their employees for the past 56 years. There is no comparable history of longstanding state regulation of railroad collective bargaining or of other aspects of the railroad industry.

Moreover, the Federal Government has determined that a uniform regulatory scheme is necessary to the operation of the national rail system. In particular, Congress long ago concluded that federal regulation of railroad labor relations is necessary to prevent disruptions in vital rail service essential to the national economy. A disruption of service on any portion of the interstate railroad system can cause serious problems throughout the system. Congress determined that the most effective means of preventing such disruptions is by way of requiring and facilitating free collective bargaining between railroads and the labor organizations representing their employees.

---

[20] Railway Labor Act of 1926, 44 Stat. (part 2) 577, as amended, 45 U. S. C. § 151 *et seq.* The purposes of the Railway Labor Act are set out in § 2 of the Act, 45 U. S. C. § 151a:

"The purposes of the chapter are: (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions."

Rather than absolutely prohibiting strikes, Congress decided to assure equitable settlement of railroad labor disputes, and thus prevent interruption of rail service, by providing mediation and imposing cooling-off periods, thus creating "an almost interminable" collective-bargaining process. *Detroit & T. S. L. R. Co.* v. *Transportation Union*, 396 U. S. 142, 149 (1969). "[T]he procedures of the Act are purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute." *Railway & Steamship Clerks* v. *Florida E. C. R. Co.*, 384 U. S. 238, 246 (1966).[21] To allow individual states, by acquiring railroads, to circumvent the federal system of railroad bargaining, or any of the other elements of federal regulation of railroads, would destroy the uniformity thought essential by Congress and would endanger the efficient operation of the interstate rail system.

In addition, a state acquiring a railroad does so knowing that the railroad is subject to this longstanding and comprehensive scheme of federal regulation of its operations and its

---

[21] Under the recent amendments to the Act, adding a new § 9a, 95 Stat. 68, 45 U. S. C. § 159a (1976 ed., Supp. V), the process has been made even more "long and drawn out" insofar as it applies to publicly owned commuter rail lines such as the Long Island. The law now provides for a "cooling-off period" of up to 240 days after failure of mediation. Any party to the dispute, or the Governor of any state through which the rail service operates, may request appointment of a Presidential Emergency Board to investigate and report on the dispute. If the dispute is not settled within 60 days after creation of the Emergency Board, the National Mediation Board must hold a public hearing at which each party must appear and explain any refusal to accept the Emergency Board's recommendations. The law then requires appointment of a second Emergency Board at the request of any party or Governor of an affected state. That Emergency Board must examine the final offers submitted by each party and must determine which is the most reasonable. Finally, if a work stoppage occurs, substantial penalties are provided against the party refusing to accept the offer determined by the Emergency Board to be most reasonable.

labor relations.   See *California* v. *Taylor*, 353 U. S., at 568. Here the State acquired the Railroad with full awareness that it was subject to federal regulation under the Railway Labor Act.   At the time of the acquisition, a spokesman stated:

> "We just have a new owner and a new board of directors.   We're under the Railway Labor Act, just as we've always been.   The people do not become state employes, they remain railroad employes and retain all the benefits and drawbacks of that."

The parties proceeded along those premises for the next 13 years, with both sides making use of the procedures available under the Railway Labor Act, and with Railroad employees covered by the Railroad Retirement Act, the Railroad Unemployment Insurance Act, and the Federal Employers' Liability Act.   Conversely, Railroad employees were not eligible for any of the retirement, insurance, or job security benefits of state employees.

The State knew of and accepted the federal regulation; moreover, it operated under federal regulation for 13 years without claiming any impairment of its traditional sovereignty.   Indeed, the State's initial response to this suit was to acknowledge that the Railway Labor Act applied.   It can thus hardly be maintained that application of the Act to the State's operation of the Railroad is likely to impair the State's ability to fulfill its role in the Union or to endanger the "separate and independent existence" referred to in *National League of Cities* v. *Usery*, 426 U. S., at 851.

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*Reversed and remanded.*