**Miguel A. ALAMO, et al., Plaintiffs,**

v.

**AUTORIDAD DE COMUNICACIONES DE PUERTO RICO, Defendant.**

Civ. No. 81–2404 GG.

United States District Court,
D. Puerto Rico.

Aug. 17, 1983.

Arnaldo Granados Estrada, Hector Lugo Bougal, Hato Rey, P.R., for plaintiffs.

Heber H. Lugo, San Juan, P.R., for defendant.

## OPINION AND ORDER

GIERBOLINI, District Judge.

This is an action to recover unpaid wages resulting from defendant's failure to pay plaintiffs in accordance with the minimum wage provisions of the Fair Labor Standards Act (FLSA) as amended, 29 U.S.C. Section 201 et seq. The present suit was originally filed in a local court of the Commonwealth of Puerto Rico and was removed pursuant to Section 1441 of Title 28 U.S.C. Jurisdiction is alleged under 28 U.S.C. Section 1331.

Plaintiffs have filed a motion for summary judgment alleging that defendant the Puerto Rico Communications Authority is a corporation of the Commonwealth of Puerto Rico that operates as a private business involved in nontraditional governmental

functions which are not part of integral government operations. In light of this, they aver that the minimum wage provisions of the FLSA apply to defendant employer.

Defendant filed its response to plaintiffs' motion for summary judgment and requested the dismissal of the action. The matter was set for hearing. At the hearing, statements for both parties were heard and simultaneous briefs were filed thereafter specifically addressing the issue of whether the activities conducted by defendant constitute integral operations in areas of traditional governmental functions. The case stands submitted on this issue.

### I

The original FLSA enacted in 1938 required employers covered by the Act to pay their employees a minimum hourly wage and to pay them at one and one-half times their regular hourly rate for all time worked in any workweek in excess of forty hours. *See,* 29 U.S.C. Secs. 206(a), 207(a)(1). Until 1974, the Act excluded the States and their political subdivisions from its coverage. 29 U.S.C. Sec. 203(d). In that year, however, the law was amended to extend its provisions to almost all public employees employed by the States and by their political subdivisions.

In *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Supreme Court held that the 1974 Amendments were invalid insofar as they operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions. *Id.* at 852, 96 S.Ct. at 2474. It further emphasized that Congress may not exercise its power to regulate commerce so as to force directly upon the States its choices as to how essential decisions regarding the conduct of integral governmental functions are to be made. *Id.* at 855, 96 S.Ct. at 2475. This emphasis on traditional governmental functions and traditional aspects of state sovereignty was meant to require an inquiry into whether the federal regulation affects basic State prerogatives in such a way as would be likely to hamper the state government's ability to fulfill its role in the

Union and endanger its separate and independent existence. *United Transportation Union v. Long Island Railroad Company,* 455 U.S. 678, 686, 102 S.Ct. 1349, 1354, 71 L.Ed.2d 547 (1982).

In confining the parameters of the sovereignty limitation to those public services or activities which involve traditional or integral governmental functions, the Court in *National League of Cities* identified as typical, functions such as fire prevention, police protection, sanitation, public health and parks and recreation. 426 U.S. at 851, 96 S.Ct. at 2474. But a caveat was added to the effect that those examples were obviously not an exhaustive catalogue of the numerous line and support activities which are well within the area of traditional operations of state and local governments. 426 U.S. at 851, 96 S.Ct. at 2474.

However, it should be noted that the determination of whether a federal law impairs a State's authority with respect to areas of traditional state functions is a difficult one since *National League of Cities* does not provide a specific test to be applied in resolving whether a particular government function falls within the protected area of state sovereignty. Cf. *United Transportation Union, supra. See, Amersbach v. City of Cleveland,* 598 F.2d 1033 (6th Cir.1979).

Certain governmental activities which have been found to be outside the reach of congressional power under the commerce clause since they involve traditional or integral functions include, public schools and hospitals, *Williams v. Eastside Mental Health Center, Inc.,* 669 F.2d 671, 677–78 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 318, 74 L.Ed.2d 294; solid waste disposal, *Hybud Equipment Corp. v. City of Akron, Ohio,* 654 F.2d 1187, 1196 (6th Cir. 1981), vacated and remanded on other grounds, 455 U.S. 931, 102 S.Ct. 1416, 71 L.Ed.2d 640 (1982); operation of a municipal airport, *Amersbach v. City of Cleveland, supra;* health care of the aged and sick, *NLRB v. Highview, Inc.,* 590 F.2d 174, vacated in part on other grounds, 595 F.2d 339 (5th Cir.1979); road building and mainte-

nance, *Molina-Estrada v. Puerto Rico Highway Authority*, 680 F.2d 841 (1st Cir.1982).

In deciding an issue very similar to the one before us, the Court in *Amersbach v. City of Cleveland, supra,* suggested that consideration be given to such factors as whether the activity benefits the community as a whole; whether it was made available to the public at little or no expense; whether it was undertaken for the purpose of public service rather than profit; whether the government was its principal provider; and whether the government was particularly well suited to provide the service or activity because of a community-wide need for it. Applying those factors, the court of appeals found a function of recent development, such as the operation of an airport, to be an integral governmental function within the meaning of *National League of Cities.*

In the case of *Molina-Estrada v. Puerto Rico Highway Authority, supra,* our own Circuit Court of Appeals upheld a decision of this court and in so doing applied those same tests and analogies. Therein, the court of appeals found that the Highway Authority is an integral part of the Commonwealth government since it is attached to the Commonwealth's Department of Transportation and Public Works; issues no stock and although it can float bonds, spend money, charge tolls and fees, own and dispose of property, sue and be sued, the Commonwealth's legislature did not intend it to be considered in any sense a private body. Its bonds, like other government obligations, are tax exempt and it further arranges for the building of roads, sometimes builds roads itself, operates toll road and keeps its roads in repair.

In the opinion of the court of appeals, the listed activities were sufficient to indicate that the Highway Authority was responsible for "traditional" or "integral" government activities. More importantly, the court cogently established: "Let any who doubt the deep-rooted and traditional connections between roads, commerce, *communications* and society read, V.W. von Hagen, *The Roads that led to Rome* (1967) ...". (Emphasis supplied). Precisely, the present case deals with communications.

II

While part of the Spanish Crown, Puerto Rico adopted the same pattern employed by most, if not all European governments regarding the ownership and management of all communications facilities and services.

The telegraph service in Puerto Rico was operated by the Spanish government. This service was later transferred to the United States Signal Corps who in turn transferred it in 1901 to the Insular Government. It was assigned to the Interior Department as Bureau of Insular Telegraph. The telephone service was commenced as the Insular Telephonic Service in 1906 and was also assigned to the Interior Department. See affidavit attached to defendant's motion filed on April 20, 1982.

In 1914, the Executive Council of Puerto Rico, with the approval of the Governor and of the President of the United States, granted a license to construct and operate a telephone system in certain areas of Puerto Rico to private entrepreneurs. That system is the one known as the Puerto Rico Telephone Company (the PRTC). The Insular Government, however, retained its own telephone system to serve other areas.

Until recently, the PRTC was a Delaware corporation operated as a subsidiary of International Telephone & Telegraph Company. In 1974 the Commonwealth's legislature established the Puerto Rico Telephone Authority (PRTA), purchased the stock of PRTC and commenced the operation of that telephone system. *Puerto Rico Telephone Company v. FCC,* 553 F.2d 694 (1st Cir. 1977).

Pursuant to Law No. 25 of May 6, 1974 (27 L.P.R.A. 401, et seq), PRTA was empowered to acquire the system and all the common stock issued by the PRTC. It was provided that in the event of the acquisition of the common stock of the PRTC all the members of the governing board of the PRTA would constitute the board of directors of the company. It was further provided that its executive director would also act as president of the company. 27 L.P.R.A. 405.

The Supreme Court of Puerto Rico in the recent case of *Aurea E. Torres v. Enrique Jiménez, et al,* 82 J.T.S. 91, June 2, 1982, held that even though the PRTC is incorporated in Delaware as a private corporation, the PRTA is the owner of 100% of its stock. Additionally, the court found that the legislative intent of Law No. 25 clearly reflects that the PRTC was acquired to be part of the public corporations system and therefore, for certain purposes, depending on the particular case, it will be regarded as a public or private corporation.

The defendant herein Puerto Rico Communications Authority (PRCA), however, was created by Law No. 212 of May 12, 1942, 27 L.P.R.A. 291 et seq, and the insular telegraph and telephone services were transferred to it. The term insular telegraph was deemed to include all the telegraphic and telephonic communications systems belonging to and operated by the People of Puerto Rico.[1]

The enabling statute makes it clear that "the Governor of Puerto Rico, the Commissioner of the Interior of Puerto Rico and the Commissioner of Agriculture and Commerce of Puerto Rico (presently Secretary of Transportation and Public Works, Secretary of Agriculture and Secretary of Commerce, respectively), are created a body corporate and politic constituting a public corporation and *governmental instrumentality* of the People of Puerto Rico by the name of Puerto Rico Communications Authority", 27 L.P.R.A. 293(a) (emphasis supplied).

The PRCA has the power of eminent domain, 27 L.P.R.A. 296(h). It may charge and collect fees for the use of its facilities, sufficient to pay the expenses incurred and for the payments of bonds, 27 L.P.R.A. 296(*l*). The monies collected by the PRCA must be deposited in qualified depositories for funds of the Commonwealth Government, 27 L.P.R.A. 302 and it must also submit to the governor and the legislature after the close of each fiscal year, a financial statement, a report of its business activities during the preceding fiscal year, and a complete report on the status of its activities. 27 L.P.R.A. 309.

The *raison d'être* of the PRCA is to promote the general welfare, increase commerce and prosperity for the benefit of the Commonwealth of Puerto Rico. 27 L.P.R.A. 312(a). It may float bonds, and the bonds, like all other government obligations, are tax exempt. 27 L.P.R.A. 312(c). The United States has recognized the PRCA as a "governmental instrumentality of the Commonwealth of Puerto Rico" in granting loans of some $85 million through the Rural Electrification Administration. This Administration is the only bondholder of the bonds issued by the PRCA which in turn are guaranteed by another instrumentality of the Government of Puerto Rico: the Government Development Bank. See Exhibits C, D, and F of defendant's motion filed on August 2, 1982.

Undoubtedly, the services provided by the PRCA are for the benefit of the community as a whole and are undertaken for the purpose of public service, not profit. In the rural areas of Puerto Rico, the Authority is the principal and only provider of these services.[2] In fact, the PRCA was created with the primary purpose of providing services to areas of the island not covered under the then existing franchises of the PRTC.[3]

Moreover, the government is best suited to provide these services given the impact upon a particular sector of the community—the rural areas—where private enterprise has shown little or no interest in rendering telegraphic[4] or telephonic services.

---

1. The words "People" and "Insular" were changed to "Commonwealth" pursuant to the Constitution of the Commonwealth of Puerto Rico. *See,* 27 L.P.R.A. 292.

2. Telegraphic services in Puerto Rico have always been rendered by the PRCA and its predecessors. See sworn statement of the Director of the PRCA filed on April 20, 1982.

3. See Decision and Order issued on February 20, 1975 by the National Labor Relations Board, 24th Region in Case No. 24–RC–5524, *Puerto Rico Telephone Co.,* employer v. *Unión de Tronquistas de Puerto Rico, et al,* petitioner, marked as Exhibit 1 of plaintiff's motion of August 2, 1982.

4. See note 2, *supra.*

The fact that the PRCA charges and collects fees for the use of its facilities only in an amount sufficient to cover expenses and for the payment of its bonds—see 27 L.P. R.A. 296(*1*)—indisputably signifies that the PRCA's services may be provided at little or no direct expense to the public. *Amersbach v. City of Cleveland, supra.*

Since the Authority's activities are comprised within *National League of Cities'* category of "traditional" or "integral" governmental functions, the FLSA's minimum wage law does not apply to these plaintiffs.

WHEREFORE, in view of the foregoing, it is ordered that plaintiffs' motion for summary judgment be and is hereby denied. It is further ordered that defendant's motion to dismiss be and is hereby granted and consequently, the present action is dismissed.

The clerk shall enter judgment accordingly.

SO ORDERED.