BEATTY, Justice.
Appeal by defendant, Alabama Elk River Development Agency (“Development Agency”), from the denial of its motion for summary judgment in plaintiffs action against it to recover overtime wages and liquidated damages under the provisions of 29 U.S.C. § 201 et seq., of the Fair Labor Standards Act of 1938. Pursuant to Rule 5, A.R. App.P., this Court granted permission for an interlocutory appeal.
The Development Agency was created in 1966 “in the interest of the unified development of the Alabama portion of the Elk River watershed and for purposes of cooperation with the Tennessee Elk River area development agency” as a state development agency, in accordance with Code of 1975, § 33-12-1. In 1967, the defendant entered into a memorandum of understanding with the Tennessee Valley Authority (“TVA”), the Elk River Development Association, and the Tennessee Elk River Development Agency that defined areas of responsibility and established guidelines for cooperation among the four organizations in a program aimed at fully developing all resources of the Elk River watershed. The Elk River watershed is composed of ten counties located in Alabama and Tennessee.
The four organizations sought to develop a program aimed at revitalizing the “Lower Elk Area,” which included Limestone County, Alabama, by developing new rural residential living areas. Planning money was appropriated to TVA by Congress in 1971 for the purpose of evaluating prospective sites for a rural residential living area to demonstrate an alternative to strip development along roadways. In late 1973, the defendant obtained options on two large tracts of land near Elkmont, Alabama. In 1976, Congress made an appropriation to TVA as starting money for Elkmont Rural Village. The Development Agency and TVA subsequently entered into a contract in 1976 whereby the defendant would acquire the property and develop and administer the Elkmont Rural Village program. The Development Agency then acquired approximately 1700 acres for the village. When Elkont Rural Village is completed, or when TVA and the Development Agency agree that the project is no longer needed, then the defendant will return to the federal treasury, through TVA, the original appropriation, plus interest based on the U.S. Treasury’s long-term interest rates.
Plaintiff, Elmer Rogers, was employed by the Development Agency on September 28, 1977, as a laborer. His duties initially included construction clean-up in the first *638 area developed in Elkmont Rural Village and cutting grass in the common area of the village. The plaintiff eventually became the maintenance man and security guard for the village. Rogers was employed by the defendant for approximately seven and one-half years preceding January 11, 1985. Rogers claims that the defendant failed to compensate him for all of the overtime hours worked by him in the performance of his duties as maintenance man and security guard. The plaintiffs duties included hard manual labor, such as repairing water pipes, cutting grass, making and cleaning trails, tilling the community garden, constructing new fences, planting pine trees, maintaining the sewage plant, patrolling the subdivision looking for intruders or hunters, responding to calls from the residents of the village regarding maintenance or security problems, and cooking and cleaning at the picnic shelter.
The Development Agency was engaged in the commercial development of a residential subdivision during the plaintiffs employment. The defendant sold subdivided lots in the village or constructed houses on the lots and subsequently sold the lots and the houses thereon. Sixty-one homes have been completed in Elkmont Rural Village, and approximately 225 people live in the village. The defendant also provided water and sewage services, security guard services, and recreational facilities to the residents of the village to facilitate its development. The defendant engaged in extensive advertising in newspapers published in Athens and Huntsville, advertising that residential lots were for sale in Elk-mont Rural Village. The Development Agency’s financial report concerning the village for the quarter of July, August, and September 1983, show that the defendant received about $52,000 from the sale of houses and about $18,000 from the sale of land, and that the defendant expended in excess of $158,000 during that quarter in building 10 houses.
The basic legal question presented is whether the Development Agency is subject to the overtime compensation provisions of the Fair Labor Standards Act.
A number of federal court decisions have wrestled with similar issues pertaining to various state and municipal activities. Until recently, these issues had been decided by the utilization of a functional test recognized in National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), upheld in Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed. 2d 1 (1981), and applied in United Transportation Union v. Long Island Railroad Co., 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed. 2d 547 (1982). That test was stated as follows in thé Long Island Railroad Co. case, at 455 U.S. 684-85, 102 S.Ct. 1353-54:
“Only recently we had occasion to apply the National League of Cities doctrine in Hodel v. Virginia Surface Mining & Reclamation Assn., Inc., 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). In holding that the Surface Mining and Reclamation Act of 1977, 30 U.S.C. § 1201 et seq. (1976 ed., Supp. IV), did not violate the Tenth Amendment by usurping state authority over land-use regulations, we set out a three-prong test to be applied in evaluating claims under National League of Cities:
“ ‘[I]n order to succeed, a claim that congressional commerce power legislation is invalid under the reasoning of National League of Cities must satisfy each of three requirements. First, there must be a showing that the challenged regulation regulates the “States as States.” [426 U.S.], at 854 [96 S.Ct., at 2475]. Second, the federal regulation must address matters that are indisputably “attributes of state sovereignty.” Id., at 845 [96 S.Ct. at 2471]. And third, it must be apparent that the States’ compliance with the federal law would directly impair their ability “to structure integral operations in areas of traditional governmental functions.” Id., at 852 [96 S.Ct., at 2474].’ 452 U.S., at 287-288, 101 S.Ct. at 2366.
“The key prong of the National League of Cities test applicable to this case is the third one, which examines whether ‘the States' compliance with the federal *639 law would directly impair their ability “to structure integral operations in areas of traditional governmental functions.” ’
[[Image here]]
“The determination of whether a federal law impairs a state’s authority with respect to ‘areas of traditional [state] functions’ may at times be a difficult one. In this case, however, we do not write on a clean slate. As the District Court noted, in National League of Cities we explicitly reaffirmed our holding in United States v. California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936), and in two other cases involving federal regulations of railroads:
“ ‘The holding of United States v. California ... is quite consistent with our holding today. There California’s activity to which the congressional command was directed was not in an area that the States have regarded as integral parts of their governmental activities. It was, on the contrary, the operation of a railroad engaged in “common carriage by rail in interstate commerce. ...” 297 U.S., at 182 [56 S.Ct. at 423].’ 426 U.S., at 854, n. 18, 96 S.Ct. at 2475, n. 18.
“It is thus clear that operation of a railroad engaged in interstate commerce is not an integral part of traditional state activities generally immune from federal regulation under National League of Cities. See also Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 422-424, 98 S.Ct. 1123, 1141-42, 55 L.Ed.2d 364 (1978) (concurring opinion). The Long Island is concededly a railroad engaged in interstate commerce.”
(Footnotes omitted.)
This seemingly well-established test, however, was replaced in Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). After tracing a tortuous path of apparently inconsistent holdings that had applied the National League of Cities test, the United States Supreme Court abandoned that formula for a test that examines “the workings of the National Government itself, rather than ... discrete limitations on the objects of federal authority.” Ibid., 469 U.S. at 552, 105 S.Ct. at 1018. It added at 469 U.S. 554, 105 S.Ct. 1019:
“[W]e are convinced that the fundamental limitation that the constitutional scheme imposes on the Commerce Clame to protect the ‘States as States’ is one of process rather than one of result. Any substantive restraint on the exercise of Commerce Clause powers must find its justification in the procedural nature of this basic limitation, and it must be tailored to compensate for possible failings in the national political process rather than to dictate a ‘sacred province of state autonomy.’ EEOC v. Wyoming, 460 U.S. [226] at 236, 103 S.Ct. [1054] at 1060 [75 L.Ed.2d 18 (1983)].
“Insofar as the present cases are concerned, then, we need go no further than to state that we perceive nothing in the overtime and minimum-wage requirements of the FLSA, as applied to SAM-TA, that is destructive of state sovereignty or violative of any constitutional provision. SAMTA faces nothing more than the same minimum-wage and overtime obligations that hundreds of thousands of other employers, public as well as private, have to meet.
“In these cases, the status of public mass transit simply underscores the extent to which the structural protections of the Constitution insulate the States from federally imposed burdens. When Congress first subjected state mass-transit systems to FLSA obligations in 1966, and when it expanded those obligations in 1974, it simultaneously provided extensive funding for state and local mass tramit through UMTA. In the two decades since its enactment, UMTA has provided over $22 billion in mass transit aid to States and localities. In 1983 alone, UMTA funding amounted to $3.7 billion. As noted above, SAMTA and its immediate predecessor have received a substantial amount of UMTA funding, including over $12 million during SAMTA’s first two fiscal years alone. In short, Congress has not simply *640 placed a financial burden on the shoulders of States and localities that operate mass-transit systems, but has provided substantial countervailing financial assistance as well, assistance that may leave individual mass transit systems better off than they would have been had Congress never intervened at all in the area. Congress’ treatment of public mass transit reinforces our conviction that the national political process systematically protects States from the risk of having their functions in that area handicapped by Commerce Clause regulation. ...
“This analysis makes clear that Congress’ action in affording SAMTA employees the protections of the wage and hour provisions of the FLSA contravened no affirmative limit on Congress’ power under the Commerce Clause. ...” (Footnotes omitted.)
This “shared investment” test furnished by the “national political process” finds meaningful application in the case at hand. TVA, a federal agency, was extensively involved in the creation of the Development Agency. The planning money for evaluating sites for residential living was appropriated in 1971 by Congress to TVA. In 1976, Congress appropriated to TVA the starting money for Elkmont Rural Village. Its completion will result in a return of the original appropriation to TVA for the federal treasury. That the enterprise was a joint federal-state undertaking is demonstrated by the content of the memorandum of understanding defining areas of responsibility and guidelines for cooperation between the agencies party to the enterprise. Significant to the federal involvement was TVA’s commitment:
“TVA Agrees To:
“(1) Provide (or assist in obtaining) technical assistance and support for the Association and the Agencies in their area development Activities.
“(2) Assume within the limits of available funds, primary responsibility for planning, construction, and operation of a comprehensive water control system in the watershed as part of the area development program.
“(3) Work with the Agencies in obtaining local financial participation in this program.
“(4) Through its Office of Tributary Area Development, provide liaison among the parties and their cooperating agencies.”
Thus, while this Court has applied the Garcia test to find that the FLSA applies to the Development Agency, we would reach the same conclusion were we required to apply the National League of Cities test. Indeed, the development of the Elk River watershed as a real estate venture where residential lots and homes are sold commercially is not an “area of traditional government functions,” nor has it been shown how the Development Agency’s compliance with the overtime provisions of the FLSA would “directly impair” Alabama’s ability “to structure integral operations in areas of traditional governmental functions.” National League of Cities, supra.
Let the judgment be affirmed.
AFFIRMED.
MADDOX, ALMON, ADAMS and HOUSTON, JJ., concur.