**Edward F. FARLEY and Thomas J. Finn, Plaintiffs–Appellants,**

v.

**METRO–NORTH COMMUTER RAILROAD, Defendant–Appellee.**

**No. 476, Docket 88–7748.**

United States Court of Appeals, Second Circuit.

Argued Dec. 8, 1988.

Decided Jan. 3, 1989.

Charles C. Goetsch, New Haven, Conn., (Cahill, Goetsch & DiPersia, P.C. New Haven, Conn., of counsel), for plaintiffs-appellants.

Howard L. Ganz, New York City (M. David Zurndorfer, Joseph Baumgarten, Proskauer Rose Goetz & Mendelsohn, New York City, of counsel), for defendant-appellee.

Before KAUFMAN, OAKES and CARDAMONE, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

In our era, in which theories of interpretation abound, and some argue that the search for authorial intent resembles jousting at windmills, the courts frequently are called upon to enforce laws of disputed meaning. Armed only with text, legislative history, and the canons of statutory construction, a judge must ascertain what Congress intended the law to be. In this quest, we are mindful of the words of Learned Hand: "[I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of a dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).

## I

Appellants, representing approximately 1000 members of the United Transportation Union (UTU) and the Brotherhood of Locomotive Engineers (BLE), sought recovery of allegedly unpaid overtime wages owed by Metro–North Commuter Railroad to its employees pursuant to section 7 of the Fair Labor Standards Acts. 29 U.S.C. § 207(a)(1) (1982). Enacted in 1937, the maximum hours rules require employers in interstate commerce to pay one-and-a-half times their regular rates to employees for every hour worked over forty, unless management falls within a statutory exemption. Normally, railroads regulated by the Interstate Commerce Act (ICA) are not covered by section 7. Section 13(b)(2) exempts "an employer engaged in the operation of a common carrier by rail and subject to the provisions of part 1 of the Interstate Commerce Act." 29 U.S.C. § 213(b)(2) (1982).[1] Metro–North is such an employer. It currently operates on the former New Haven, Harlem, and Hudson lines, which have been in continuous existence since the mid–1800s.

Appellants argue that when the Interstate Commerce Commission exempted Metro–North from the ICA in November 1982,[2] the railroad became liable for payment of overtime wages under section 7 because it was no longer "subject to the provisions ... of the [ICA]" within the meaning of section 13(b)(2). In the district court, the appellee countered by asserting that the section 13(b)(2) exemption applies if a railroad is subject to some—not all—of the ICA. Holding that "the language of the statute does not unambiguously support either ... position," Judge Edelstein sought the intent of Congress in the legislative history of both exemptions.

With regard to section 13, he noted that "[t]he exemptions are designed to keep the FLSA from interfering in industries already subject to federal regulations." Moreover, the 75th Congress could not have foreseen the rise in state railroad regulation, the railroads' subsequent loss of competitiveness, and the corresponding need for deregulation. As a result, he concluded, "The language of 13(b)(2) was not meant to subject deregulated railroads to other statutory provisions, but to encompass the scope of the ICC's jurisdiction without entering into the complications of defining that scope."

The court's analysis of the ICA exemption power complemented its view of section 13. In the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895 (1980), and the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31 (1976), Congress permitted deregulation in an effort to revitalize "the financial stability of the national rail system." H.R.Conf.Rep. No. 96–1430, 96th Cong. 2d Sess. 80, *reprinted in* 1980 U.S.Code Cong. & Admin.News 3978, 4110, 4111. In addition, the court held that a section 10505 exemption does not free a carrier from the provisions of the ICA. If necessary, the ICC may revoke the exemption at any time to carry out national transportation policy. 49 U.S.C. § 10505(d) (1982). Moreover, Metro–North also remains bound by subsections (e) and (g) of section 10505. 49 U.S.C. §§ 10505(e), (g) (1982).

Accordingly, the court granted appellee's summary judgment motion, holding that Metro–North remained "subject to the provisions ... of the [ICA]" as stated in section 13(b)(2). 690 F.Supp. 268. Asserting that the construction of the statute was in error, appellants sought review in this court.

## II

In simple terms, the dispute centers on the amount of pay conductors, engineers,

---

**1.** In 1978, when the ICA was revised, part 1 was subsumed in subtitle IV of Title 49 of the United States Code. Pub.L. No. 95–473, 92 Stat. 1337 (1978).

**2.** Metro–North sought the exemption to avoid what the Interstate Commerce Commission termed "duplicative regulatory control" since "Metro–North ... [is] subject to extensive regulation by the Urban Mass Transportation Administration, as well as local governmental bodies, regarding fare and service changes, [as well as] operations and accounting procedures...." Metro–North Commuter Railroad Company–Exemption From 49 U.S.C. Subtitle IV, I.C.C. Finance Docket No. 30063 (Nov. 24, 1982).

and other train personnel shall receive for so-called "swingtime jobs," which, due to a non-working "release period" of 1–4 hours during each shift, involve more than 40 hours of duty time per week. For example, an engineer might toil from 7 a.m. to 10 a.m. on a New Haven to Grand Central Station train, followed by release time from 10 a.m. to 2 p.m. and then work again from 2 p.m. to 5 p.m. on a train from Grand Central to New Haven.

The rate of pay for release time and the amount of such time counted towards a 40 hour week were major issues between the railroad and its unions during the most recent round of collective bargaining, held in 1983. In fact, the 6 week UTU strike was partially motivated by failure to reach agreement regarding countable release time. Arbitration ultimately settled the dispute—half the release time now counts toward the 40 hour limit. The BLE contract does not contain this provision. All Metro–North employees receive time-and-one-half for work in excess of forty hours, although both contracts stipulate that there is no premium pay for release time.

Appellants contend that the maximum hour provisions of the FLSA require that all release time count as "time worked." To support this proposition, they rely primarily on a plain-meaning rule construction of § 13. Long revered among the canons of statutory construction, the plain meaning rule, as articulated by Justice Day, declares: "It is elementary that the meaning of a statute must be sought in the language in which the act is framed, and if that is plain, ... the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917).

Appellants argue that section 13 is unambiguous: a railroad is either "subject to the provisions ... of the [ICA]" or it is not. If it is, then FLSA overtime provisions do not apply. If it is not, then they do. Such an argument must not be cavalierly dismissed. When construing "humanitarian and remedial legislation" such as the FLSA, the Supreme Court cautions that "[a]ny exemp-

tion ... must ... be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretive process." *A.H. Phillips v. Walling*, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945).

Citing the ICC's exemption, which states, "we exempt Metro–North from the requirements of the [ICA]," appellants contend that the inquiry need go no further. Merely asserting that the statute is clear, however, will not make it so. Judge Edelstein correctly held the language was reasonably susceptible to more that one meaning. We do not believe it is evident, from the face of the statute, whether the phrase "subject to the provisions ... of the [ICA]" refers to some or all of the ICA. Hence the resort to legislative history was entirely appropriate.

### III

In the decade that began in 1967, the growing capital shortfall in the American railroad industry culminated with a rash of bankruptcies. By late 1975, when Congress first addressed the situation, eight major carriers in the Northeast and Midwest were in financial ruin. *See* S.Rep. No. 499, 94th Cong., 2d Sess. 3 (1975), *reprinted in* 1976 U.S.Code Cong. & Admin.News 14, 17. Seeking a comprehensive remedy for "an outmoded regulatory system" and "inadequate financial resources to improve and modernize rail facilities," S.Rep. No. 499 at 1, *reprinted in* 1976 U.S.Code Cong. & Admin.News at 15, Congress began to deregulate by passing the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4–R Act"). However, the reinvigoration process was slow and in 1980, Congress enacted the Staggers Rail Act of 1980, which has been characterized as "the sharpest shift in federal regulatory law covering rail transportation since the Interstate Commerce Act of 1887." T. Keeler, *Railroads, Freight, and Public Policy* 102 (1983). *See also* H.R. Conf.Rep. No. 1430, 96th Cong., 2d Sess. 79, *reprinted in* 1980

U.S.Code Cong. & Admin.News 4110, 4110–11.

The ICA exemption is central to the implementation of both these initiatives. It allows the ICC to exempt railroads from ICA regulations so long as they were "not necessary to carry out the [national] transportation policy." 49 U.S.C. § 10505(a)(1) (1982).[3] The exemption's purpose is to facilitate competition by substituting market-based decisions for superfluous regulatory structures. *See Brae Corp. v. United States,* 740 F.2d 1023, 1054 (D.C.Cir.1984) ("The legislative history of the Staggers Act ... indicates that Congress envisioned the Act, in general, and section 10505(a), in particular, as empowering the Commission to *remove* regulations and to introduce market factors into the rail industry."), *cert. denied,* 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985). *See generally* Note, "Fine–Tuning Deregulation: The Interstate Commerce Commission's Use of its General Rail–Exemption Power," 53 *Geo.Wash.L. Rev.* 827 (1985).

Despite the failure to cite even a single passage of legislative history indicating that Congress considered subjecting an exempted railroad to the FLSA, appellants urge us to presume the result they seek. When "the legislature enacts a provision," they argue, quoting 2A N. Singer, *Sutherland's Statutes and Statutory Construction* § 51.02 (Sands 4th ed. 1984), "it has in mind previous statutes relating to the same subject matter.... [T]he new provision is presumed in accord with the legislative policy embodied in those prior statutes." We need not consider adopting this rule because its stricture is not applicable to this case.

The FLSA, the 4–R Act, and the Staggers Act do not "relate to the same subject matter." The latter two statutes form part of the separate railroad regulatory structure to which Congress has consistently adhered for a century. *See generally United Transportation Union v. Long Island Rail Road Co.,* 455 U.S. 678, 687–88, 102 S.Ct. 1349, 1355, 71 L.Ed.2d 547 (1982). In particular, they seek to deregulate the railroad industry. The Fair Labor Standards Act, however, governs the wages and hours of employees in interstate commerce except, among others, those in the railroad industry. The legislative history of the section 13 exemption indicates that Congress intended to preserve this distinction.[4] *See New Jersey Transit Policemen's Benevolent Ass'n, Local 304 v. New Jersey Transit Corp.,* 806 F.2d 451, 454 (3d Cir. 1986), *cert. denied,* — U.S. —, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987); 82 Cong.Rec. 1698 (1937) (statement of Rep. Mead). To hold otherwise would alter 100 years of established Congressional policy without so much as a whisper from the nation's lawmakers. It is inconceivable that a statute designed to deregulate must be read to re-regulate a distressed industry in this fashion. *See also New Jersey Transit,* 806 F.2d at 454–55; *Brae,* 740 F.2d at 1055.

Such a holding would also ignore the terms of the section 10505 exemption. Regardless of the breadth of the Metro–North exemption, the ICC retains jurisdiction over the railroad because the exemption is revocable at any time if such action is required to carry out the 15 enumerated national rail policy goals. 49 U.S.C. § 10505(d) (1982). As set forth in the Staggers Act, this policy includes "encourage[ment of] fair wages and safe and suitable working conditions." *Id.* § 10101a(12). Thus, in ad-

---

**3.** Section 10505 states, in relevant part:

In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—

(1) is not necessary to carry out the transportation policy of section 10101a of this title; and

(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

49 U.S.C. § 10505(a) (1982).

**4.** Even if this legislative history could be read to indicate Congress's willingness to subject non-ICA-regulated railroads to § 7 of the FLSA, it is of no help in determining whether or not the § 10505 exemption causes this result.

dition to the other numerous pieces of legislation governing labor relations in the railroad industry, *see, e.g.,* Railway Labor Act, 45 U.S.C. § 151 *et seq.* (1982); Hours of Service Act, 45 U.S.C. § 61 *et seq.* (1982), the ICC is empowered to cancel the ICA exemption if it adversely impinges upon Metro–North employees. *See* H.R.Cong. Rep. No. 1430, 96th Cong., 2d Sess. 105, *reprinted in* 1980 U.S.Code Cong. & Admin.News 4110, 4137. Section 10505 also states that the ICC has no power to exempt any carrier from regulations dealing with baggage liability limits, restrictions on ownership and mergers, and employee protection in the event of an approved merger or consolidation. 49 U.S.C. §§ 10505(e), (g) (1982).[5]

## IV

For the foregoing reasons, Metro–North Commuter Railroad remains "subject to the provisions ... of the [ICA]." 29 U.S.C. § 213(b)(2) (1982). The judgment below is affirmed.

---

**5.** Section 10505(e) states, in relevant part: "No exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of section 1107 of this title." 49 U.S.C. § 10505(e) (1982).

Section 10505(g) states: "The Commission may not exercise its authority under this section (1) to authorize intermodal ownership that is otherwise prohibited by this title, or (2) to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle." 49 U.S.C. § 10505(g) (1982).