93 Cal.Rptr.2d 342 (2000)
22 Cal.4th 471
993 P.2d 996
Robert SCHEIDING et al., Plaintiffs and Appellants,
v.
GENERAL MOTORS CORPORATION, Defendant and Respondent.
[And four other cases.][*]
No. S073196.
Supreme Court of California.
March 9, 2000.
Rehearing Denied April 12, 2000.
*343 Brayton, Harley, Curtis, Novato, Brayton, Purcell, Curtis & Geagan, Alan R. Brayton, Novato, Claudia J. Martin, San Mateo, James L. Oberman, Philip A. Harley, Oakland; Wolf & Ellis, Wolff, Ellis & Clausen, Gregory R. Ellis, San Francisco, Joan Wolff and Gerald Clausen, San Francisco, for Plaintiffs and Appellants.
Kazan, McClain, Edises, Simon & Abrams and James L. Oberman, Oakland, for Asbestos Victims of America as Amicus Curiae on behalf of Plaintiffs and Appellants.
Allison Beck; Geffner & Bush, Robert Kropp, Jr., Burbank; John Roven & Associates and John Roven, for International Association of Machinists and Aerospace Workers as Amicus Curiae on behalf of Plaintiffs and Appellants.
Sturgeon, Keller, Phillips, Gee & O'Leary, Brock Phillips, San Francisco; Brasher Law Firm and William A. Brasher for the Burlington Northern and Santa Fe Railway Company as Amicus Curiae on behalf of Plaintiffs and Appellants.
Grace, Genson, Cosgrove & Schirm, Philip R. Cosgrove, Thomas H. Hutchinson, Los Angeles, Kimberly A. Smith, Carl E. Lovell, David K. Schultz, Los Angeles; McCutchen, Doyle, Brown & Enersen, David M. Heilbron, San Francisco, Leslie G. Landau and Robert A. Brundage, San Francisco, for Defendant and Respondent.
Hugh F. Young, Jr.; Mayer, Brown & Platt, Kenneth S. Geller and Donald M. Falk, Washington, Dist. of Columbia, for Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendant and Respondent.
BROWN, J.
Almost 75 years ago, the United States Supreme Court held that the Locomotive Boiler Inspection Act (BIA or Act), now codified at 49 United States Code section 20701 et seq., "extends to the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances." (Napier v. Atlantic Coast Line (1926) 272 U.S. 605, 611, 47 S.Ct. 207, 71 L.Ed. 432 (Napier).) Since Congress intended the Act to occupy this field, "requirements by the states are precluded, however commendable or however different their purpose. [Citations.]" (272 U.S. at p. 613, 47 S.Ct. 207.)
We conclude Napier continues to articulate the preemptive scope of the BIA and thus forecloses state law causes of action against locomotive manufacturers for defective design of their product. Accordingly, we affirm the judgment of the Court of Appeal in favor of defendant.

I. FACTUAL AND PROCEDURAL BACKGROUND
Plaintiffs are former railroad employees, their spouses, and their survivors, who brought suit against defendant General Motors Corporation (defendant) for asbestos-related injuries.[1] Until 1984, defendant, *344 through its electro-motive division, manufactured diesel locomotives containing asbestos materials. The trial court granted judgment on the pleadings and summary judgment on the grounds the BIA preempted plaintiffs' strict product liability and other state common law claims.
Relying on Napier, supra, 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432, the Court of Appeal affirmed. It expressly disagreed with the contrary decision in Viad Corp. v. Superior Court (1997) 55 Cal.App.4th 330, 64 Cal.Rptr.2d 136 (Viad), in which the Court of Appeal held that the federal preemption analysis in Medtronic, Inc. v. Lohr (1996) 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (Medtronic) and Silkwood v. Kerr-McGee Corp. (1984) 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (Silkwood) had undermined the viability of Napier. We granted review to resolve this conflict in the law.

II. DISCUSSION
"It has long been settled that Congress intended federal law to occupy the field of locomotive equipment and safety, particularly as it relates to injuries suffered by railroad workers in the course of their employment." (Law v. General Motors Corp. (9th Cir.1997) 114 F.3d 908, 910 (Law).)
Napier, supra, 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432, is the genesis of this settled law. Napier involved a Georgia statute that prescribed an automatic door to the locomotive firebox and a Wisconsin statute that required a locomotive cab curtain. Invoking the BIA, interstate carriers brought suit to enjoin enforcement of these laws, which prohibited use within each state of locomotives not equipped with the specified devices. The question presented was "whether the Boiler Inspection Act has occupied the field of regulating locomotive equipment used on a highway of interstate commerce, so as to preclude state legislation." (272 U.S. at p. 607, 47 S.Ct. 207.)
The Supreme Court noted that as originally enacted in 1911, the BIA applied only to the boiler. (Napier, supra, 272 U.S. at p. 608, 47 S.Ct. 207.) In 1915, however, it was extended "to `include the entire locomotive and tender and all parts and appurtenances thereof.'" (Ibid.) At the same time, Congress conferred upon the Interstate Commerce Commission (Commission) the responsibility and authority for promulgating rules and regulation to implement the Act (see 272 U.S. at pp. 608-609, 47 S.Ct. 207), authority now exercised by the Secretary of Transportation. Although the Commission had the power to designate requirements for locomotives, "it ha[d] made no order requiring either a particular type of fire box door or a cab curtain. Nor ha[d] Congress legislated specifically in respect to either device." (Id. at p. 609, 47 S.Ct. 207.)
The court acknowledged that "[e]ach device was prescribed by the state primarily to promote the health and comfort of engineers and firemen" and was therefore "a proper exercise of its police power...." (Napier, supra, 272 U.S. at p. 610, 47 S.Ct. 207.) Nevertheless, the requirements came within the scope of authority delegated to the Commission, i.e., regulation of "the equipment of locomotives." (Id. at p. 612, 47 S.Ct. 207.) "The fact that the Commission has not seen fit to exercise its authority to the full extent conferred [by regulating fire box doors or cab curtains], has no bearing upon the construction of the act delegating the power." Since Congress "intended to occupy the field" of locomotive equipment (id. at p. 613, 47 *345 S.Ct. 207), the standard set by the Commission must displace all state requirements notwithstanding a lack of conflict between that standard and state law. (Ibid.; cf. Southern Ry. Co. v. Lunsford (1936) 297 U.S. 398, 402, 56 S.Ct. 504, 80 L.Ed. 740 [no liability under the BIA for failure to perform if locomotive part is not "definitely prescribed by lawful order" of the Commission].)
The Ninth Circuit Court of Appeals recently explained the practical rationale for this determination: "This broad preemptive sweep is necessary to maintain uniformity of railroad operating standards across state lines. Locomotives are designed to travel long distances, with most railroad routes wending through interstate commerce. The virtue of uniform national regulation `is self-evident: locomotive companies need only concern themselves with one set of equipment regulations and need not be prepared to remove or add equipment as they travel from state to state.' [Citations.]" (Law, supra, 114 F.3d at p. 910.) Moreover, "[a]part from compensating victims of accidents for their injuries, the purpose of tort liability is to induce defendants to conform their conduct to a standard of care established by the state. [Citation.] A railroad equipment manufacturer found to have negligently designed a braking system, for example, is expected to modify that system to reduce the risk of injury. If the manufacturer fails to mend its ways, its negligence may be adjudged willful in the next case, prompting a substantial punitive damages award. If each state were to adopt different liability-triggering standards, manufacturers would have to sell locomotives and cars whose equipment could be changed as they crossed state lines, or adhere to the standard set by the most stringent state. Either way, Congress's goal of uniform, federal railroad regulation would be undermined. [Citation.]" (Id. at pp. 910-911; cf. Carrillo v. ACF Industries, Inc. (1999) 20 Cal.4th 1158, 1168-1169, 86 Cal.Rptr.2d 832, 980 P.2d 386 (Carrillo) [finding same rationale applies under the federal Safety Appliance Acts (49 U.S.C. § 20301 et seq.) ].)
We agree with the Court of Appeal that the foregoing principles govern the viability of plaintiffs' state law causes of action, which are based upon their claim defendant manufactured a defective product by utilizing asbestos in the design of its locomotives. As the court explained: "There is no doubt that the Secretary of Transportation has authority to regulate the design of the locomotive and could order the elimination of asbestos in locomotive components.[2] Imposing tort liability on railroad locomotive manufacturers clearly would affect `"the design, the construction, and the material" of locomotives.' ([Law, supra, 114 F.3d at p. 911, quoting Napier, supra, 272 U.S. at p. 611, 47 S.Ct. 207.]) This effect on interstate commerce would be both `direct and substantial.' (English v. General Electric Co. [ (1990) ] 496 U.S. [72,] 85 [110 S.Ct. 2270, 110 L.Ed.2d 65] [(English)].) As Law explains, the imposition of tort liability on railroad equipment manufacturers would force them to conform to design and construction standards imposed by the *346 states. `This would transfer the regulatory locus from the Secretary of Transportation to the state courtsa result the BIA was clearly intended to foreclose. [Citation.]' (Law, supra, at pp. 911-912, fn. omitted.)"
This conclusion follows numerous state and lower federal court decisions that have found the BIA preempts state tort damage actions.[3] We find this consensus further indication that Napier, supra, 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432, remains the controlling and dispositive authority on the preemptive scope of the BIA.
The United States Supreme Court has, moreover, impliedly affirmed that Napier remains viable. In Consolidated Rail Corp. v. Pennsylvania Pub. Utility, supra, 536 F.Supp. 653 (Consolidated Rail), the plaintiff railroad challenged a Pennsylvania statute that required locomotives to have speed recorders and indicators, contending the BIA preempted this state regulation. The state countered that when Congress enacted the Federal Railroad Safety Act (49 U.S.C. § 20101 et seq.), it "redistributed railroad regulatory authority so that the total-preemption test of the [BIA] is no longer valid." (Consolidated Rail, supra, 536 F.Supp. at p. 654.) The district court rejected the state's argument and found Napier controlling. (Id. at pp. 655-657.) Although Congress could have repealed or recodified the BIA, instead it "concluded that [the Act] was working well, and specifically determined to keep it independently in force `without change.'" (536 F.Supp. at p. 656, fn. omitted.) "If the Railroad Safety Act were to change the preemption test for those areas [already governed by the BIA], the states could expand their regulatory authority, allowing a new reservoir of differing, and possibly incompatible, railroad-safety law. This would run counter to Congress's purpose of uniform national regulation. It is contrary to Congress's purpose in passing the Railroad Safety Act to allow the states to reoccupy fields from which they previously had been displaced." (Id. at pp. 656-657, fns. omitted.)
On appeal, the Supreme Court summarily affirmed. (Pennsylvania Public Utility Com. v. Consolidated Rail Corp., supra, 461 U.S. 912, 103 S.Ct. 1888, 77 L.Ed.2d 280.) Such summary actions "should ... be understood as ... applying principles established by prior decisions to the particular facts involved." (Mandel v. Bradley (1977) 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199.) We thus have strong, if indirect, evidence Napier continues to control with respect to the scope of BIA preemption.
We also have evidence of legislative intent to this effect. As the court in Consolidated Rail, supra, 536 F.Supp. at pages 656-657, observed, when Congress enacted the Federal Railroad Safety Act in 1970, it specifically identified the BIA as among the "particular laws" governing railroad safety that "have served well," so well that the Committee on Interstate and Foreign Commerce reviewing the matter "chose to continue them without change." (H.R.Rep. No. 91-1194, 2d Sess. (1970), reprinted in 1970 U.S.Code Cong. & Admin. News, p. 4105.) In discussing the role of the states in this area, the committee noted that "[a]t the present time where the Federal Government has authority[, e.g., under the BIA], with respect to rail safety, it preempts the field." (Id., 1970 U.S.Code Cong. & Admin. News at p. *347 4108.) Additionally, when Congress recodified the BIA in 1994, the House Report stated "this bill makes no substantive change" and disclaimed any intent to "impair the precedent value of earlier judicial decisions...." (H.R.Rep. No. 103-180, 1st Sess.(1993), reprinted in 1994 U.S.Code Cong. & Admin. News, p. 822; see Finley v. United States (1989) 490 U.S. 545, 554-555, 109 S.Ct. 2003, 104 L.Ed.2d 593.) In light of this explicit statement, we may "apply the presumption that Congress was aware of ... earlier judicial interpretations [including Napier] and, in effect, adopted them. [Citations.]" (Keene Corp. v. United States (1993) 508 U.S. 200, 212, 113 S.Ct. 2035, 124 L.Ed.2d 118.)
Plaintiffs take the position that in the wake of Medtronic, supra, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700, and Silkwood, supra, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443, preemption analysis has evolved to narrow the proper construction and application of Napier. We consider this argument with caution in light of the United States Supreme Court's clear admonition that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals [and state courts applying federal law] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." (Rodriguez de Quijas v. Shearson/American Express, Inc. (1989) 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526; Agostini v. Felton (1997) 521 U.S. 203, 237, 117 S.Ct. 1997,138 L.Ed.2d 391.)
In any event, we are unpersuaded on the merits. (Cf. Carrillo, supra, 20 Cal.4th at pp. 1167-1169, 86 Cal.Rptr.2d 832, 980 P.2d 386 [rejecting the same argument in considering the preemptive effect of the federal Safety Appliance Acts].) Unlike the present case, in which the United States Supreme Court has found field preemption, Medtronic involved an express preemption provision contained in the Medical Device Amendments of 1976(MDA). Construing the provision according to its terms, a plurality of the court found no congressional intent to oust all state common law negligence actions.[4] "If Congress intended such a result, its failure even to hint at it is spectacularly odd, particularly since Members of both Houses were acutely aware of ongoing product liability litigation." (Medtronic, supra, 518 U.S. at p. 491, 116 S.Ct. 2240.) "Unlike the statute construed in Cipollone [v. Liggett Group, Inc. (1992) 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407], for instance, pre-emption under the MDA does not arise directly as a result of the enactment of the statute; rather, in most cases a state law will be pre-empted only to the extent that the [federal Food and Drug Administration] has promulgated a relevant federal `requirement.'" (Medtronic, supra, at p. 496, 116 S.Ct. 2240.) The state action was statutorily permitted because the regulatory agency had yet to impose any such requirement as to the device in question. (Id. at pp. 496-497, 116 S.Ct. 2240.) In contrast to this permissible interplay of state and federal law, the Supreme Court has determined that the BIA occupies the field of locomotive equipment and thus any "requirements by the states are precluded, however commendable or however different their purpose. [Citations.]" (Napier, supra, 272 U.S. at p. 613, 47 S.Ct. 207.)
In Silkwood, the high court found no intent to preclude an award of punitive damages under the Atomic Energy Act in light of the overall statutory scheme. (Silkwood, supra, 464 U.S. at pp. 250-255, 104 S.Ct. 615.) "By subsequent enactment of the Price-Anderson Act, Congress `assumed that persons injured by nuclear accidents *348 were free to utilize existing state tort law remedies.' Considering the historical record, `[t]his was true even though Congress was fully aware of the [Nuclear Regulatory] Commission's exclusive ... authority over safety matters.' [Citation.]" (Carrillo, supra, 20 Cal.4th at p. 1168, 86 Cal.Rptr.2d 832, 980 P.2d 386.) By contrast, like the Safety Appliance Acts at issue in Carrillo, the BIA "contains no evidence Congress assumed or intended state remedies for design defects would be preserved. Given the goal of national uniformity, allowing such claims would substantially impair its function." (Carrillo, supra, at pp. 1168-1169, 86 Cal.Rptr.2d 832, 980 P.2d 386.)
Drawing on Medtronic and Silkwood the Court of Appeal in Viad, supra, 55 Cal.App.4th 330, 64 Cal.Rptr.2d 136, reached a contrary conclusion by defining the field preempted by the BIA to exclude plaintiffs' state tort actions. It noted that "when the BIA was enacted, a railroad employee would have had no right of action against the manufacturer." (Viad, supra, at p. 338, 64 Cal.Rptr.2d 136; see MacPherson v. Buick Motor Co. (1916) 217 N.Y. 382, 111 N.E. 1050.) The court reasoned that since "[t]he doctrine of strict liability of a manufacturer was not established until much later" (Viad, supra, at p. 338; see Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897), Congress could not have intended to preempt such actions. (Viad, supra, 55 Cal.App.4th at p. 338, 64 Cal.Rptr.2d 136.) But this reasoning proves too much: Equally logically, Congress could not have intended to preserve that which did not exist. Furthermore, the BIA was enacted as an amendment to the Federal Employers' Liability Act (45 U.S.C. § 51 et seq., FELA), which significantly expanded the ability of railroad workers to seek recourse for on-the-job injuries and has been broadly interpreted. (See Urie v. Thompson (1949) 337 U.S. 163, 180-191, 69 S.Ct. 1018, 93 L.Ed. 1282; Viad, supra, 55 Cal.App.4th at p. 338, 64 Cal.Rptr.2d 136 ["One of the primary purposes of FELA was to eliminate defenses to tort liability and to facilitate recovery. [Citation.]"].) Having enlarged the basis for recovery under federal law, Congress reasonably could have intended to restrict it under state law.
Moreover, unlike the situation in Silkwood, the field occupied by the BIA must necessarily extend to state law tort recovery. That is, the BIA cannot remove "the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances" from the purview of state regulation (Napier, supra, 272 U.S. at p. 611, 47 S.Ct. 207) without concomitantly precluding tort actions premised on a defect in such design, construction, or material. Any other result would place regulation of these requirements in the hands of state juries, thereby constraining the Secretary of Transportation's regulatory authority and undermining the goal of uniformity. (Law, supra, 114 F.3d at pp. 910-911; cf. Baltimore & Ohio R. Co. v. Groeger (1925) 266 U.S. 521, 530-531, 45 S.Ct. 169, 69 L.Ed. 419.)
In arguing that the scope of the BIA does not extend to their claims, plaintiffs also rely on English, supra, 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65. In that case, the Supreme Court held that the field preempted by federal law did not extend to a state law cause of action for intentional infliction of emotional distress arising out of actions by the plaintiffs employer allegedly taken in retaliation for her nuclear safety complaints. In reaching this conclusion, the court made clear that determining an issue of field preemption focuses not only on the purpose of the state law in question but its "actual effect" with respect to federal regulation. (Id. at p. 84, 110 S.Ct. 2270.) "[T]o fall within the pre-empted zone, [the state law] must have some direct and substantial [rather than remote] effect" on the regulated subject matter. (Id. at p. 85, 110 S.Ct. 2270.) This standard does not avail plaintiffs here. We do not hesitate to conclude that *349 allowing their state law claims would have a direct and substantial effect on the uniformity of locomotive design, construction, and material mandated by Congress through the BIA.
Plaintiffs contend our determination inverts the burden of proof on preemption, which places the onus on the defendant to establish congressional intent to eclipse state law. (Medtronic, supra, 518 U.S. at p. 486, 116 S.Ct. 2240.) Their contention assumes we write on a clean slate, but we do not. Napier has long established Congress "intended to occupy the field" of locomotive equipment (Napier, supra, 272 U.S. at p. 613, 47 S.Ct. 207), a field that extends to the "design" of such equipment. (Id. at p. 611, 47 S.Ct. 207.) Thus, defendant has carried its burden. To the extent plaintiffs seek to avoid the impact of Napier by arguing Medtronic and Silkwood have sufficiently altered the preemption landscape to warrant a different conclusion, they assume the burden of demonstrating a contrary congressional intent. Applying the analysis derived from Carrillo, we find they have failed to do so. (Carrillo, supra, 20 Cal.4th at pp. 1167-1169, 86 Cal.Rptr.2d 832, 980 P.2d 386.)
Plaintiffs cite "`the assumption that the historic police powers of the States [relating to matters of health and safety] were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" (Medtronic, supra, 518 U.S. at p. 485, 116 S.Ct. 2240.) We question plaintiffs' premise that rail workers' health and safety are concerns primarily within the historic police powers of the states. "Railroads have been subject to comprehensive federal regulation for nearly a century.... There is no comparable history of longstanding state regulation ... of the railroad industry." (Transportation Union v. Long Island R. Co. (1982) 455 U.S. 678, 687-688, 102 S.Ct. 1349, 71 L.Ed.2d 547, fns. omitted.) This observation applies equally to safety matters as the enactment of the BIA and the Safety Appliance Acts in the early 1900's attests. In this regard, uniformity has long been the congressional touchstone. (See, e.g., Penna. R.R. Co. v. Pub. Service Comm. (1919) 250 U.S. 566, 569, 40 S.Ct. 36, 63 L.Ed. 1142 ["The subject-matter in this instance [rail safety appliances] is peculiarly one that calls for uniform law...."].) The statutory scheme, as construed by the courts and reaffirmed by Congress, reflects that any historic state police powers must yield to this clear and manifest purpose. Moreover, the Supreme Court considered this factor in Napier, but nevertheless determined the BIA occupies the entire field of locomotive equipment regardless of the salutary purpose of any additional state requirement. (Napier, supra, 272 U.S. at pp. 610-611, 47 S.Ct. 207.)
It is also immaterial to our analysis that plaintiffs' causes of action raise no conflict with any provision of the BIA or its implementing regulations, that they will not impair nationwide uniformity, or that they are consistent with the safety purposes underlying the BIA. (Napier, supra, 272 U.S. at pp. 610-611, 47 S.Ct. 207; cf. Southern Ry. Co. v. R.R. Com., Indiana (1915) 236 U.S. 439, 448, 35 S.Ct. 304, 59 L.Ed. 661 [rejecting argument for nonpreemption based upon lack of conflict between state regulation and Safety Appliance Acts].) "[T]he power delegated to the Commission by the Boiler Inspection Act as amended is a general one. It extends to the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances." (Napier, supra, 272 U.S. at p. 611, 47 S.Ct. 207.) Having occupied the field, Congress left no area within which states may act. In essence, these arguments conflate field preemption with conflict preemption. (Cf. Carrillo, supra, 20 Cal.4th at p. 1166, 86 Cal.Rptr.2d 832, 980 P.2d 386; see also English, supra, 496 U.S. at p. 79, 110 S.Ct. 2270, fn. 5["[F]ield pre-emption may be understood as a species of conflict preemption: A state law that falls within a pre-empted field conflicts with Congress' *350 intent (either express or plainly implied) to exclude state regulation."].)
Nor do we accord significance to the absence of any specific regulation of asbestos by the Secretary of Transportation or the FRA. (See Napier, supra, 272 U.S. at p. 613, 47 S.Ct. 207.) Even assuming plaintiffs' factual premise (see ante, fn. 2; see also 49 C.F.R. §§ 229.25(b), 229.41, 229.83, 229.89 (1998) [addressing locomotive insulation and related matters]), the particulars of the regulatory scheme are entirely within both the purview and the prerogative of the Secretary of Transportation. (Napier, supra, at pp. 612-613, 47 S.Ct. 207.) "`[T]he will of Congress upon the whole subject is as clearly established by what it had not declared, as by what it has expressed.'" (Southern Ry. Co. v. R.R. Com., Indiana, supra, 236 U.S. at p. 447, 35 S.Ct. 304.) In effect, plaintiffs' lawsuits would have a retroactive regulatory effect by now allowing design control the BIA denied the state at the time of manufacture.
We also find no merit in plaintiffs' contention that Napier addresses only state legislation regulating locomotive equipment, not common law tort remedies. (See, e.g., Napier, supra, 272 U.S. at pp. 607, 613, 47 S.Ct. 207.) The United States Supreme Court has long rebuffed efforts to draw this artificial distinction: "Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left unhampered. Such regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy. Even the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme." (San Diego Unions v. Garmon (1959) 359 U.S. 236, 246-247, 79 S.Ct. 773, 3 L.Ed.2d 775; see Law, supra, 114 F.3d at pp. 910-911.) Contrary to plaintiffs' implication, the compelling need for uniform locomotive equipment standards prevents state remedies for injured persons from coexisting with federal regulation.
We are equally unpersuaded the BIA does not apply to locomotive manufacturers. (See 49 U.S.C. § 20701 [BIA speaks expressly to "railroad carrier[s]" and not manufacturers]; but see id., § 21302(a) [liability for violation of the Act applies to any "person" including manufacturers]; former 45 U.S.C. § 34, as amended by Pub.L. No. 100-342 (June 22, 1988) § 14(7)(A), 102 Stat. 624; Viad, supra, 55 Cal.App.4th at p. 334, 64 Cal.Rptr.2d 136.) "This distinction [between locomotive manufacturers and operators] is without significance. The BIA preempts any state action that would affect `the design, the construction, and the material' of locomotives. [Citation.] Imposing tort liability on railroad equipment manufacturers would do just that, by forcing them to conform to design and construction standards imposed by the states. This would transfer the regulatory locus from the Secretary of Transportation to the state courtsa result the BIA was clearly intended to foreclose. [Citation.]" (Law, supra, 114 F.3d at pp. 911-912, fn. omitted; cf. Taylor AG Industries v. Pure-Gro (9th Cir.1995) 54 F.3d 555, 561, fn. 3 ["analysis focuses not on whom the legal duty is imposed, but on whether the legal duty constitutes a state law requirement" already covered by federal law].) Sanctioning state common law actions against manufacturers would raise the same concerns for impairing nationwide uniformity essential to the regulation of railroads as would sanctioning such actions against operators. (Law, supra, 114 F.3d at pp. 910-911; cf. Carrillo, supra, 20 Cal.4th at p. 1169, 86 Cal.Rptr.2d 832, 980 P.2d 386.)[5]
*351 Finally, plaintiffs argue that even if their defective design claims fall, their failure-to-warn causes of action survive the BIA's preemptive sweep because the statute does not address warning or instruction labels. We agree with the Ninth Circuit Court of Appeals that "[a]s for warning requirements, these too are within the scope of the Secretary's authorityan authority which the Secretary has often invoked. [Citations.]" (Law, supra, 114 F.3d at p. 911; cf. Carrillo, supra, 20 Cal.4th at p. 1165, 86 Cal.Rptr.2d 832, 980 P.2d 386, fn. 1 [Safety Appliance Acts preempt failure-to-warn claims]; Ouellette v. Union Tank Car Co. (D.Mass.1995) 902 F.Supp. 5, 10 [same, Federal Railroad Safety Act].) Moreover, "[t]his argument begins from an incorrect premise: the relevant inquiry is not whether a label falls under the BIA but whether [the subject of such a label] does." (Oglesby v. Delaware & Hudson Railway Co., supra, 180 F.3d at p. 461.) Pertinent regulations address the question of locomotive insulation (see, e.g., 49 C.F.R. §§ 229.25(b), 229.41, 229.83, 229.89 (1998)), thus any failure-to-warn claims relating to that subject come within our previous analysis.

DISPOSITION
The judgment of the Court of Appeal is affirmed.[6]
GEORGE, C.J., KENNARD, J., BAXTER, J., WERDEGAR, J., and CHIN, J., concur.
Dissenting Opinion by MOSK, J.
I dissent.
This action involves claims by former railroad employees and their survivors against General Motors Corporation for asbestos-related injuries suffered as a re suit of exposure to asbestos materials in locomotives manufactured by General Motors. The majority conclude that General Motors, which until 1984 manufactured locomotives using asbestos materials for insulation, is shielded against common law damage claims by former railroad employees because such claims are preempted by the Locomotive Boiler Inspection Act (BIA or the Act), title 49 of the United States Code, section 20701 et seq.
I disagree. It is true that Napier v. Atlantic Coast Line (1926) 272 U.S. 605, 607, 47 S.Ct. 207, 71 L.Ed. 432, on which the majority principally rely, held that the BIA was intended to occupy the field of regulating locomotive equipment used on a highway of interstate commerce. I am not persuaded, however, that the "field" referred to in Napier extends to the claims at issue in this case.
Under the majority's result, employees (as well as passengers and bystanders) are entitled to no remedy against a manufacturer for their injuries caused by any flaws in its design or manufacture of a product, no matter how egregious. This is so even when, as here, the state damage actions do not conflict with any federal regulation or with the goals of the BIA. I doubt that such absolute immunity for manufacturers is consistent with the congressional intent underlying the BIA, which was enacted to increase safety for workers and passengers on our nation's railroads.

I
The question presented is whether the BIA preempts state common law tort claims against General Motors for injuries caused by defects in its products. Contrary to the majority's assertion, the point *352 is not well settled. Napier does not address it; nor has the United States Supreme Court addressed it in any subsequent decision. We must begin, therefore, with the assumption that preemption is disfavored and we should be reluctant to find it.
Cipollone v. Liggett Group, Inc. (1992) 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407, summarizes the law of preemption as follows. "Article VI of the Constitution provides that the laws of the United States `shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.' [(U.S. Const., art. VI, cl. 2).] Thus, since our decision in McCulloch v. Maryland [ (1819) 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579], it has been settled that state law that conflicts with federal law is `without effect.' [Citation.] Consideration of issues arising under the Supremacy Clause `start[s] with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.' [Citation.] Accordingly, `"[t]he purpose of Congress is the ultimate touchstone"' of pre-emption analysis. [Citation.] [¶] ... In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law [citation], or if federal law so thoroughly occupies a legislative field `"as to make reasonable the inference that Congress left no room for the States to supplement it."'"
In CSX Transp., Inc. v. Easterwood (1993) 507 U.S. 658, 668, 113 S.Ct. 1732, 123 L.Ed.2d 387, involving preemption of common law tort claims involving railroad safety, the United States Supreme Court referred to the "presumption against preemption." "In the interest of avoiding unintended encroachment on the authority of the States ... a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption." (Id. at pp. 663-664, 113 S.Ct. 1732.) Thus, we should be particularly reluctant to find preemption when, as here, the federal law at issue involves health and safety.

II
The language of the BIA indicates no clear and manifest purpose to preempt common law tort actions by railroad employees against locomotive manufacturers. On its face, the Act applies simply to railroad carriers. The phrase "railroad carriers" appears repeatedly. (See, e.g., 49 U.S.C. § 20701 ["railroad carrier" is required to use inspected, safe equipment]; id., § 20702 [Secretary of Transportation must ensure that every "railroad carrier" inspect its equipment]; id., § 20703 [accident reporting requirements for "railroad carrier"].) The text of the statute says nothing about railroad manufacturers.
The legislative history supports the conclusion that Congress intended the BIA to apply only to railroad carriers. Enacted as an amendment to the Federal Employers' Liability Act (FELA; 45 U.S.C. § 51 et seq.), which provides the exclusive remedy for recovery of damages by a railroad employee against a railroad carrier, the BIA was aimed at protecting employees and the traveling public from defective locomotive equipment. (Urie v. Thompson (1949) 337 U.S. 163, 188, 190-191, 69 S.Ct. 1018, 93 L.Ed. 1282; see also Viad Corp. v. Superior Court (1997) 55 Cal.App.4th 330, 334, 64 Cal.Rptr.2d 136.) It imposes on interstate railroads an absolute duty to provide safe equipment, and subjects railroads to FELA suits by their employees for BIA violations. (Urie v. Thompson, supra, 337 U.S. at p. 189, 69 S.Ct. 1018.) Although the original legislation contained a penalty provision that would have applied to "any common carrier or any seller of a locomotive boiler" (Sen. No. 236, 61st Cong., 1st Sess., p. 4 (1910), italics added), it was amended to exclude sellers. As enacted, it expressly applied to any common carrier or carriers (defined as a railroad) *353 and its officers, agents, and employees, engaged in transportation by railroad. The decision to exclude "locomotive sellers" from the ambit of the BIA strongly suggests that Congress did not intend to provide nonrailroads, such as General Motors in this case, with greater preemptive immunity from state tort claims than that enjoyed by the railroads.[1]
The overall structure of the BIA also supports the conclusion that it applies only to railroad carriers. As a federal district court recently explained: "[I]t is clear that the BIA as a whole establishes a regulatory framework within which carriers and the Secretary of Transportation  but not railroad manufacturers  operate. Nothing about the structure of the BIA indicates that Congress intended to bring railroad manufacturers within its regulatory web, let alone to preclude state common law actions against railroad manufacturers. [¶] ... The statute's text does not mention railroad manufacturers, its structure does not invite reading them into it, and federalism and history counsel leaving them out." (Lorincie v. Southeastern Pennsylvania Transp. Auth. (E.D.Pa.1998) 34 F.Supp.2d 929, 934.)
The majority assert that the BIA "`contains no evidence Congress assumed or intended state remedies for design defects would be preserved.'" (Maj. opn., ante, 93 Cal.Rptr.2d at p. 348, 993 P.2d at p. 1001.) It is apparent, however, that Congress could not have assumed or intended that the BIA would preempt common law claims involving health and safety by railroad employees against manufacturers because such claims did not exist in 1911; a railroad employee had no right of action against a manufacturer under the then prevailing strict privity doctrine. Indeed, the doctrine of strict products liability was not established until the 1960's. (See Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897; Vandermark v. Ford Motor Co. (1964) 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168.) In my view, the "field" referred to in Napier v. Atlantic Coast Line, supra, 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432, does not reasonably include tort liability against nonrailroad entities that was unknown at the time Congress enacted the BIA. (See Viad Corp. v. Superior Court, supra, 55 Cal.App.4th at pp. 338-339, 64 Cal.Rptr.2d 136.)[2]
Nor am I persuaded that a more prescient Congress would have intended to grant manufacturers immunity from damage claims by railroad employees by preempting state law claims under circumstances where identical claims may subject the railroad carrier to FELA liability. Such a rule could result in the anomaly of imposing liability on a railroad carrier for an injury it did not cause, while blanketing the manufacturer with immunity from any liability for injuries caused by its defective products. (Cf. Ellison v. Shell Oil Co. (9th Cir.1989) 882 F.2d 349 [railroad may maintain an indemnity action for injuries to employee caused by a defective railroad car].) It also appears unlikely that Congress intended to shield manufacturers from all liability for the injuries of passengers and bystanders, who are not entitled to bring claims under the FELA.
Recent preemption decisions by the United States Supreme Court also dictate a different result, instructing that common law tort claims for injury are not automatically preempted even when federal *354 legislation has been held generally to occupy the "field" in question. Rather, a defendant seeking immunity must establish that permitting such remedies would frustrate congressional objectives in enacting the legislation on which the claim of preemption is based. Thus, in Silkwood v. Kerr-McGee Corp. (1984) 464 U.S. 238,104 S.Ct. 615, 78 L.Ed.2d 443, involving a common law tort action based on injuries from plutonium contamination, the United States Supreme Court rejected a claim that the action was preempted by the Atomic Energy Act (42 U.S.C. § 2011 et seq.) because the federal legislation occupied the entire field of nuclear safety concerns. The court held that the parameters of a preempted field "should not be judged on the basis that the Federal Government has so completely occupied the field of safety that state remedies are foreclosed but on whether there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law." (464 U.S. at p. 256, 104 S.Ct. 615.) It examined the legislative history of the Atomic Energy Act and determined that there was no indication of congressional intent to preclude state law remedies.
Similarly, Medtronic, Inc. v. Lohr (1996) 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 rejected a claim that the Medical Device Amendments of 1976 (21 U.S.C. § 360c et seq.) preempted state law on the safety and effectiveness of medical devices intended for human use. Emphasizing the presumption against preemption, the court looked at the structure and purpose of the statute. It found nothing in the text of the statute, which contained no provision regarding a right of action against manufacturers, and nothing in its legislative history suggesting a congressional intent to bar product liability actions. "The legal duty that is the predicate for the Lohrs' negligent manufacturing claim is the general duty of every manufacturer to use due care to avoid foreseeable dangers in its products.... These state requirements ... escape pre-emption, not because the source of the duty is a judge-made common-law rule, but rather because their generality leaves them outside the category of requirements that [the preemption statute] envisioned to be `with respect to' specific devices such as pacemakers." (518 U.S. at pp. 501-502, 116 S.Ct. 2240.)
Under the tests applied by the United States Supreme Court in Silkwood and Medtronic, the BIA does not preempt plaintiffs' claims against General Motors. As discussed, neither the text nor the legislative history of the Act permits the conclusion that Congress intended to restrict employees and others from obtaining a common law remedy for injuries caused by manufacturers' defective products; such a remedy did not even exist at the time the BIA was enacted. More specifically, General Motors presented no evidence of any BIA regulations concerning asbestos. According to the materials submitted by the parties, the use of asbestos in locomotives has never been and apparently never will be regulated. (Off. of Safety Assurance and Compliance, Rep. to Cong., Locomotive Crashworthiness and Cab Working Conditions (Sept.1996), pp. 10-10 to 10-12.) Locomotive manufacturers freely made the decision to use asbestos materials; now those manufacturers, including General Motors, have ceased using asbestos and have adopted policies prohibiting its future use, presumably because of its toxicity. (Ibid.) The state law remedies at issue here pose no threat to federal objectives under the BIA, past, present, or future. Nor is there any irreconcilable conflict between federal and state standards with regard to asbestos use.
The majority rest their holding on the premise that allowing these plaintiffs a remedy against General Motors will undermine national uniformity with regard to railroad equipment. Unlike the majority, I doubt that promoting national uniformity  as opposed to safety  was the primary purpose of the BIA. But even if it were, I do not agree that regulatory uniformity will be impaired unless we insulate *355 General Motors from damages for injuries caused by its defective products. The majority raise a false specter of railroads having to change equipment at state lines. As discussed, there has never been any form of federal regulation on the issue of asbestos use in locomotives that would contravene plaintiffs' theory of recovery, nor is it plausible that any other state will require trains to install defective asbestos insulation on locomotives. Indeed, because of its well-known dangers, asbestos insulation is no longer used in the manufacture of locomotives.

III
The majority's result will unfairly impair the ability of former railroad employees and their families to seek an adequate remedy for their asbestos-related injuries. I fail to see how that rationally advances any federal policy under the BIA. Because I discern no clear and manifest evidence of congressional purpose to preempt the claims raised herein, I would reverse the judgment of the Court of Appeal.
NOTES
[*] Hellquist v. General Motors Corporation (No. A076333); Blackburn v. General Motors Corporation (No. A076341); Goodyear v. General Motors Corporation (No. A076352); Umphriss v. General Motors Coloration (No. A076730).
[1] As the Court of Appeal detailed: "Harry Goodyear, Victor Hellquist, Robert Scheiding, Gaylord Blackburn and Billy Umphriss worked in or around locomotives at some time between the 1940's and the 1980's. Plaintiffs in each of these five actions alleged below that [defendant's] locomotives and related equipment were defective because they released asbestos fibers into the atmosphere where these railroad employees worked and onto their clothing. Goodyear and Hellquist are wrongful death and survival lawsuits brought by the spouses of workers who died as a result of asbestos illnesses. Scheiding, Blackburn and Umphriss were filed by the injured employees themselves. The complaints in each case allege against [defendant] causes of action for negligence, strict liability, and false representation, as well as wrongful death and survival in Goodyear and Hellquist and negligent infliction of emotional distress and loss of consortium in Scheiding, Blackburn and Umphriss."
[2] It appears the Federal Railroad Administration (FRA) has, in fact, addressed the question of asbestos in locomotives. In a 1996 report to Congress, the FRA noted that the two primary builders, one being defendant, had 10 years earlier ceased to use friable asbestos and were "careful to avoid the use of asbestos in new and rebuilt locomotives." (FRA, U.S. Dept. of Transportation, Rep. to Congress, Locomotive Crashworthiness and Cab Working Conditions (Sept. 1996) p. 12-9.) Moreover, the FRA "could find no evidence of asbestos being a health problem for crews of older locomotives." (Ibid.) It determined that final regulations to protect workers from exposure to asbestos published by the Occupational Safety and Health Administration were sufficient to "ensure effective long-term management of asbestos." (Id. at p. 10-11.) Accordingly, it "recommend[ed] no action be taken on the issue of asbestos in locomotives, except to the extent any new information requires that the issue be reopened." (Id. at p. 12-9.) We grant the parties' request to take judicial notice of these portions of the FRA's report. (See Evid.Code, § 452, subd. (c).)
[3] E.g., Oglesby v. Delaware & Hudson Railway Co. (2d Cir.1999) 180 F.3d 458, 460-462; Springston v. Consolidated Rail Corp. (6th Cir. 1997) 130 F.3d 241, 244-245; Missouri Pacific R.R. v. Railroad Com. of Texas (5th Cir. 1988) 850 F.2d 264, 268; Marshall v. Burlington Northern, Inc. (9th Cir. 1983) 720 F.2d 1149, 1151-1152; Consolidated Rail Corp. v. Pennsylvania Pub. Utility (E.D.Pa.1982) 536 F.Supp. 653, affirmed (3d Cir. 1982) 696 F.2d 981, affirmed sub nom. Pennsylvania Public Utility Com. v. Consolidated Rail Corp. (1983) 461 U.S. 912, 103 S.Ct. 1888, 77 L.Ed.2d 280; Key v. Norfolk Southern Ry. Co. (1997) 228 Ga.App. 305, 491 S.E.2d 511; In re Train Collision at Gary, Indiana (Ind.Ct.App.1996) 670 N.E.2d 902, 910-911; Carter v. Consol. Rail Corp. (1998) 126 Ohio App.3d 177, 709 N.E.2d 1235.
[4] In his concurring opinion, Justice Breyer did not disagree with this determination. (Medtronic, supra, 518 U.S. at pp. 503-508, 116 S.Ct. 2240 (cone. opn. of Breyer, J.).) The remaining justices concluded the state common law damages actions did impose "requirements" within the meaning of the MDA and were therefore preempted. (Medtronic, supra, 518 U.S. at p. 509, 116 S.Ct. 2240 (cone. & dis. opn. of O'Connor, J.).)
[5] Plaintiffs further contend the scope of the BIA extends only to the on-line operation of locomotives and therefore does not govern redress for their injuries, which resulted from work on the equipment in roundhouses and repair shops. (See 49 U.S.C. § 20701; see also id., § 20902(a)(1) [authorizing Secretary of Transportation to investigate accidents "occurring on the railroad line"].) Plaintiffs did not submit this argument until their petition for rehearing in the Court of Appeal, and the court did not address it. Accordingly, we find it was not timely raised and will not consider it further. (Cal. Rules of Court, rule 29(b)(1).)
[6] To the extent it is inconsistent with our analysis and holding, we disapprove Viad, supra, 55 Cal.App.4th 330, 64 Cal.Rptr.2d 136.
[1] Only in 1988 and 1992, after the locomotives at issue here were manufactured by General Motors, was the civil penalty provision of the BIA amended to refer to "any person," defined as including any manufacturer of railroad equipment. (Former 45 U.S.C. § 34; Pub.L. No. 100-342, § 14(7) (June 22, 1988), 102 Stat. 624; Pub.L. No. 102-365, §.9(a)(8) (Sept. 3, 1991) 106 Stat. 972.)
[2] The strict privity doctrine required that only the immediate buyer of a product could recover for injuries caused by a defect. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 948, p. 332.) Thus, at the time the BIA was enacted, a railroad employee would have had no right of action against the manufacturer.